[Crim. No. 13027.   Second Dist., Div. Five.   Jan. 10, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. JOHN LOUIS MOORE, Defendant and Appellant.

Caryl Warner, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Stanton J. Price, Deputy Attorney General, for Plaintiff and Respondent.

KAUS, P. J.—After a court trial defendant was convicted of murder in the second degree. On appeal, as below, he argues that uncontradicted evidence of diminished capacity due to mental illness shows him to be guilty of manslaughter only. These are the facts:

Defendant was born in 1931. He quit school at the age of 17. After doing various odd jobs he entered the army. He was assigned to a military fire department for a couple of years and spent eight months in Korea. He received an honorable discharge. He then went to work as a government security guard. He quit and joined the fire department in Troy, New York, his home town. There he became convinced that other firemen were "ganging up" on him. In 1955 he was admitted to the Veterans Administration Hospital in Albany, New York, with complaints of nervousness and tightening of the stomach "due to being picked on by his fellow employees."[1]

---

[1]The 1955 hospital record summarizes his "present illness" as follows: "In June 1954 when he got a job as a fireman on the Troy Fire Department through the influence of friends, because of the 'knocking' he was taking, because his fellow employees did things to 'burn' him, because they constantly needled him, hammered him, he became extremely nervous and couldn't take the 'pressure' and finally he quit on December 10th, 1954. He never felt that he could fight back because he did not have the education the others did. They were too smart for him. He never could think of the right thing to say back at them. He was constantly preoccupied with difficulties the others were creating for him and every day he feared to go to work on account of this. He became extremely nervous, his stomach tightened, he lost his appetite and has been getting worse in this respect. All he can think of is what he has been through at the hands of his fellow employees. In addition to this in order to forget his troubles he stayed up late nights drinking and carousing and leading a generally abnormal life. The last 2 days before admission he couldn't stop thinking about his difficulties. He finally did not know which way to go. He was too easy-going with people. He never fought back. He felt he let the people down who got him the job. He finally got so extremely nervous that he presented himself at this hopsital for treatment."

He was discharged on May 6, 1955, with the following diagnosis: "Schizophrenic Reaction, acute, paranoid type in partial remission. Treated, improved."

On October 10, 1963, he again entered the Veterans Administration Hospital in Albany. His then illness was summarized as set forth in the footnote.[2] The hospital record contains the following evaluation: "The patient is mentally clear and properly oriented. He becomes tearful when he speaks of his confusion and his lack of accomplishment. He speaks despairingly of himself at all times and insists that his plight is all his own fault. He states repeatedly that it is impossible for him to express himself so that anyone else will understand what he means. On admission he seemed definitely paranoic in his ideas that an employer was openly sadistic in his treatment of him which precipitated one of his hospitalizations. However this has been the only manifestation of paranoia elicited; he states merely that people know he is mixed up and he knows he is mixed up and that people avoid him because of this."

After four days in the hospital defendant began to complain of "tightness" in his stomach. This was treated and disappeared. In conferences with a therapist he reported that he found his home town of Troy depressing. He wanted to go to the west coast where he had worked before. Early in January he received an offer of a room from a friend in California. He was discharged on January 8, 1964. The final diagnosis on that discharge was "Schizophrenic Reaction, paranoid type with anxiety, treated, improved."

Although, as defendant told one of the examining psychiatrists, "he has been carrying a gun for protection because people pick on him," defendant's record contains no evidence of any prior acts of violence or tendencies in that direction. His only brush with the law was an arrest in New York in 1952 for carrying a gun.

The friend in California who had offered him a room was

---

[2] "The patient was discharged from the Psychiatric Service in May, 1955. At that time he thought that everyone on the street could tell that he was abnormal so he left the community and went to the west coast. Here he worked at his trade of bartender, first one place and then another, in Arizona, New Mexico and California. He states that he was hospitalized once or twice while he was there and remembered receiving ECT at one time. One month ago he returned to his mother's home in Troy and has since that time become increasingly depressed until the night before admission he began to express suicidal thoughts which frightened him. His mother reports that he does not leave the house for days at a time, will not eat and walks the floor at night instead of sleeping."

one Douglas D. Carmack, whom defendant had met during an earlier stay in this state. Defendant traveled to California to join Carmack and on the way he acquired a pistol.

While defendant stayed with Carmack he felt depressed. He was again having stomach problems. He kept vomiting and could not hold his food down. On January 30 he was thinking about suicide. He told Carmack that he wanted to return to the hospital. Carmack tried to talk him out of it. Defendant then went into the bathroom, loaded his gun, returned to the room where Carmack was lying on a bed and emptied the gun in Carmack's direction. Several bullets entered Carmack's body and he eventually died.

Defendant, clad in underwear and a torn bathrobe, ran out into the street calling for help. He encountered the caretaker of the apartment house. Defendant shouted "I just shot a guy." The caretaker said: "For God's sake did you shoot Carmack?" Defendant replied: "Yep, I shot him. I am sorry, but I shot him."

Officer Taylor of the Long Beach Police Department encountered defendant sitting on the steps in front of the apartment house still clad in his underwear and robe. Taylor asked him what happened. Defendant said: "I just shot Doug." The officer then asked him: "Did you kill him?" Defendant answered: "Yes I did."[3]

The preliminary examination was held on February 6, 1964. The information charging defendant with murder was filed in the superior court on February 18. On February 21 defendant pleaded "not guilty" and "not guilty by reason of insanity." Pursuant to section 1027 of the Penal Code the court appointed Doctors Nielsen and Abe to examine defendant. In the meanwhile defendant had been hospitalized in the Los Angeles County jail hospital. His stay was stormy. When admitted he was screaming and hallucinating, "audio and visual." For self-protection he was put in a padded cell. The next day he started to eat his feces. He slept on the floor. The following day he smeared his feces all over himself and on the walls of his cell. He was treated with thorazine and after several other episodes gradually became more quiet and cooperative.

Doctor Nielsen reported to the court on March 3, 1964. His

[3]This answer as well as further conversation between defendant and various police officers was stricken from the record after an objection based on *Miranda* v. *Arizona*, 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

summary was as follows: "The defendant is a chronic schizophrenic and is dangerous. He was insane at the time of the commission of the crime and he is insane at the present time." Doctor Abe's report is dated April 12, 1964. His conclusion is as follows: "Defendant probably was legally sane at the time of commission of offense. Although difficult to ascertain, defendant possibly did not form intent in view of his prior history of mental illness and his unstable paranoid personality. Defendant, however, appears to have known that he did wrong."

Before the case was called for trial on June 3, 1964, defendant was also examined by the only psychiatrist who later testified at the trial, Doctor Kurt Fantl. Doctor Fantl's conclusion was that defendant was insane at the time of the homicide and at the time of the doctor's examination on May 15.

On the basis of these reports the court, on June 3, expressed a doubt concerning defendant's then sanity. (Pen. Code, § 1368.) A hearing was set for June 5. On that date the court found that the defendant was not capable of cooperating with his attorney and he was duly committed to the state hospital at Atascadero.

In December 1965 defendant, in propria persona, filed a petition for a writ of habeas corpus. In essence he contended that he was then sane. A writ was issued, returnable January 7, 1966. On that day, two more physicians, Doctors Bielinski and Tatunjian were appointed to examine defendant pursuant to section 1368—not 1027—of the Penal Code. Doctor Tatunjian, by report dated January 25, found him to be sane then and at the time of the offense.[4] On February 3, 1966, defendant was found presently sane and after various continuances at defendant's request, trial actually started on May 31.

By stipulation the People's case was submitted on the transcript of the preliminary hearing and some additional testimony. The only defense witness was Doctor Fantl.

Doctor Fantl had spent the entire morning of May 15, 1964, with defendant and another two and one-half hours just before testifying on June 2, 1966. Admittedly his testimony is based on his acceptance of defendant's version of the incident.[5] This, he reported as follows: "He describes the

---

[4]The record does not show any request to Doctor Tatunjian to express an opinion concerning defendant's sanity two years earlier. Doctor Bielinski restricted his opinion to defendant's capacity to cooperate with counsel during the trial. He found him to be sane enough to stand trial.

[5]It should be noted that at no point did either side move to restrict defendant's statements to the various psychiatrists to the limited purpose

incident. as to him an entirely unexplainable event. He says that he absolutely had no reason to kill Doug, that Doug was his only friend. Doug had never offended him. Doug had never done anything to hurt him. There was never any quarreling. There was never any difficulty. That this particular day when the incident occurred, he was in very severe pain. He had very severe pain in his stomach. That he was distraught. That his mind kept racing back and forth. And suddenly, he has no idea for what reason and why, he got up, went into the bathroom, loaded his gun and started shooting. He claims that it was not until after he heard the noise of the gun, the discharge of the gun that he actually realized what he had been doing. He claimed that he had absolutely no motive. That he was terribly upset when he saw what he had done. That he immediately ran downstairs yelling for help. That he was so upset that he didn't even bother to put on any clothing. He claims that he did not know at the time whether he had killed the man but that he did not really find that out until the following day.''

In Doctor Fantl's opinion defendant, ''when he did what he did, he was reacting. He was not thinking. He was not deliberating. He was simply acting like a sleepwalker would act or a person under hypnosis.''

Acording to the witness, schizophrenia is today thought to be an illness with a hereditary chemical basis. The adrenal glands produce poisonous chemicals which in turn cause ''disturbance in perception so that a person is unable to perceive the world the way we perceive it.'' The production of these chemicals is more marked under stress. Under such circumstances schizophrenics ''are living in a nightmare from which they cannot wake up.'' In the doctor's opinion defendant did not premeditate, did not deliberate, did not even intend to injure the deceased. He was in a fugue state, a condition of automotism, which the doctor also described as a ''state of altered consciousness.''[6]

The People offered no evidence bearing directly on the issue of diminished capacity. After argument and discussion with the court defendant was found guilty of murder in the second degree.

---

of showing the information upon which they based their opinions. (Cf. *In re Spencer*, 63 Cal.2d 400, 412 [46 Cal.Rptr. 753, 406 P.2d 33].)

· [6]The People correctly point out that Doctor Fantl's conception of the meaning of premeditation and malice were somewhat erroneous. (Cf. *People v. Gorshen*, 51 Cal.2d 716, 723 [336 P.2d 492].)

On the insanity phase of the trial it was stipulated that Doctor Fantl would testify that at the time of the killing defendant was insane within the meaning of the M'Naughton rule. The psychiatric reports of Doctors Nielsen, Abe, Tatunjian and Bielinski were offered in evidence by defendant, as were certain hospital records. Defendant was found sane.

On appeal the main thrust of defendant's argument is the same as below: that from the uncontradicted evidence the court could not have found him guilty of a crime greater than voluntary manslaughter. He urges this court to exercise its power to reduce the degree of the crime. (Pen. Code, § 1181, subd. 6.) An alternative argument, advanced more forcefully at the oral hearing than in the brief, is that the trial court did not fully appreciate the import of certain recent cases in the field of diminished capacity.

None of the psychiatrists except Doctor Fantl addressed themselves to the question of diminished capacity as distinguished from legal insanity. Unquestionably, if we were able to say that the trial court was bound to accept Doctor Fantl's testimony, his conclusions point to manslaughter rather than murder and the proper thing for us to do would be to reduce the degree and affirm the judgment as modified.

This division of this court in two recent opinions (*People* v. *Farr*, 255 Cal.App.2d 679 [63 Cal.Rptr. 477] and *People* v. *Hoxie*, 252 Cal.App.2d 901 [61 Cal.Rptr. 37]) has recognized that in at least four cases (*People* v. *Goedecke*, 65 Cal.2d 850 [56 Cal.Rptr. 625, 423 P.2d 777]; *People* v. *Nicolaus*, 65 Cal.2d 866 [56 Cal.Rptr. 635, 423 P.2d 787]; *People* v. *Ford*, 65 Cal.2d 41 [52 Cal.Rptr. 228, 416 P.2d 132] and *People* v. *Wolff*, 61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959]), the Supreme Court has reduced convictions of murder of the first degree to murder of the second degree after holding that the uncontradicted psychiatric testimony on the issue of diminished capacity so demanded. In *Hoxie* we noted that we knew of no comparable appellate reduction from murder to manslaughter. In *Farr* we refused to so reduce a conviction although there, as here, the People did not offer any evidence on the issue of diminished capacity. We pointed to certain weaknesses in the testimony of the psychiatrist who testified for Farr, which made his conclusions less than compelling.

Although Doctor Fantl's testimony hangs together far better than that of the psychiatrist in *Farr*, we still cannot

say that a trial court applying correct legal principles to his testimony was bound to accept it.[7]

■ The trouble is that the record reveals beyond a doubt that at the time the court found the defendant to be guilty of murder it was not aware of the full significance of the doctrine of diminished capacity.[8] During his final argument, counsel for defendant placed heavy reliance on *People* v. *Borchers,* 50 Cal.2d 321, 329 [325 P.2d 97], a case in which the trial court, on motion for a new trial, reduced a verdict from second degree murder to manslaughter. Defense counsel was pointing out that "passion" need not mean "rage" or "anger." He proposed to read a passage from *Borchers.* He was interrupted by the court as follows: "THE COURT: Counsel, before you read on, is there anything within the statutory definition in this case, within the meaning of the statutory definition of manslaughter upon which this Court could find? MR. WARNER: Yes. This is the way I understand it. You have three things. You have, (1)—— THE COURT: I assume that is the purport and trend of your argument. MR. WARNER: That is what we are here for. We are here for, as I see it, to label this offense either Murder, First, Murder Second or Manslaughter. THE COURT: How does Manslaughter get into this picture? MR. WARNER: Because there are no elements of Murder First and no elements of Second Degree. THE COURT: Then the man should be acquited—— MR. WARNER: No, no. THE COURT: ——according to that argument *because Manslaughter isn't shown by any statutory definition here. . . .*" (Italics added.)

---

[7]One detail which makes us hesitate to say that Doctor Fantl's conclusions had to be accepted is this: According to Doctor Abe, defendant told him that when he went to the bathroom to load the gun it was his intention to commit suicide. When he returned to the room where the victim was, "he shot wildly for reasons unknown to him . . . on hearing the victim say 'ow' he came to and started to holler and scream to get help. . . ." The differences between this version and the one given to Doctor Fantl may be slight, but if it is recalled that defendant's thoughts and motivations during these crucial seconds are what the entire lawsuit is all about, we cannot criticize a trial court for finding any discrepancies in his story significant. Needless to say they did escape the prosecutor's attention.

[8]That we may consider the court's remarks on this question is plain. In *People* v. *Gorshen,* 51 Cal.2d 716 [336 P.2d 492] the Supreme Court deals at length with the defendant's argument that the trial court did not apply correct law to the evidence. (*Ibid.,* pp. 734-736.) Of course, as stated in *Gorshen,* remarks made by a court during argument do not have "the force of findings of fact and conclusions of law." Further they must be interpreted favorably to the judgment if they are susceptible of such an interpretation. (*Ibid.,* p. 734.) (See also *People* v. *Robarge,* 41 Cal.2d 628, 633 [262 P.2d 14].)

The Attorney General concedes, as he must, that this passage demonstrates an erroneous concept. *People* v. *Conley*, 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911], decided a few weeks before the trial of the case at bar—but not brought to the attention of the trial court—holds that the statutory enumeration of ways in which the crime of manslaughter may be committed is not inclusive, because section 192 of the Penal Code was enacted before the development of the concept of limited capacity. (*Ibid.*, p. 318.) [9]

The People suggest however, that whatever error there may have been apparent from these remarks, the court's finding of second degree murder was based simply on the fact that Doctor Fantl's testimony did not create a reasonable doubt concerning defendant's capacity to harbor malice; but after a certain passage in the court's remarks on which the People rely,[10] the court again said, in reply to defense counsel's renewed appeal to *Borchers*: ''He [Borchers] was being divorced and he wanted to conceal this long-standing relationship, and this mistress for whom he had sacrificed so much was unfaithful to him. Things of that kind entered. There was a passion toward this woman that the Court said would form the basis to support the Manslaughter. But we have here, and the only testimony we have in this connection is 'He was my friend.' There is where the difference is. *My hands get tied by*

---

[9] See also *People* v. *Aubrey*, 253 Cal.App.2d 912, 919 [61 Cal.Rptr. 772]: ''What the *Conley* opinion teaches is that there is a type of voluntary manslaughter which does not come within any of the three definitions found in Penal Code, section 192. *Conley* holds that voluntary manslaughter includes type (a), which is defined in the Penal Code, and type (b), which has been developed out of the doctrine of diminished capacity. The nonstatutory voluntary manslaughter is a homicide which may be intentional, voluntary, deliberate, premeditated, and unprovoked. It differs from murder in that the element of malice has been rebutted by a showing that the defendant's mental capacity was reduced by mental illness, mental defect or intoxication.''

[10] ''No, no. This is to say that every time a psychiatrist takes the stand and say this man for one reason or another lacked capacity, we have reasonable doubt. I can't ascribe to that. That is not true. While it is the prosecution's burden to establish each and every element of whatever offense is charged, when the defense of lack of capacity, diminished responsibility comes in, there must be such acceptable, that is, testimony not only admissible but accepted by the Court for the purpose for which it is intended and with relation to the facts in the case. If the Court is going to accept that, then we have reasonable doubt and then the prosecution hasn't made out all the elements of the case. But as I say, while it may be admissible, I can't accept it for the purpose for which it is intended, in view of the nature of other testimony in this case. It is, as far as I am concerned, speculation, frankly. . . . The nature of the testimony of the psychiatric testimony doesn't establish the reasonable doubt from the standpoint of lack of capacity, which I must establish that reasonable doubt. . . .''

*this kind of picture and I must limit myself to the evidence."*
(Italics added.)

Thus it seems quite plain that the court was still engaged in
the unnecessary search for "heat of passion." Finding none
it declared that its hands were tied, when *Conley* makes it
clear that they were not.

On July 14, 1966, about a month after the court had
resolved defendant's insanity plea against him, a motion for
new trial was argued and denied. The matter was then con-
tinued for sentencing to August 11. On that date defense
counsel was given permission to renew the motion for a new
trial.

A discussion between the court and defense counsel ensued.
It is apparent from certain remarks made by the court that it
had become familiar with *Conley*.[11] At the oral argument
before us it was suggested that any error committed at the
time defendant was found guilty of murder was thereby cured.
The theory is that on the renewed motion for new trial the
court reconsidered the evidence in the light of *Conley* and
reached the conclusion that defendant was still guilty of
second degree murder.

There are two answers to that suggestion: first, it is very
doubtful whether the court had any jurisdiction to entertain
the renewed motion for a new trial. It is not necessary here to
attempt to reconcile somewhat conflicting decisions on the
point. (Compare *In re Levi*, 39 Cal.2d 41, 45 [244 P.2d 403] ;
*People* v. *Martin*, 199 Cal. 240, 242 [248 P. 908] with *People*
v. *Risenhoover*, 240 Cal.App.2d 233 [49 Cal.Rptr. 526] ; and
*People* v. *Hensel*, 233 Cal.App.2d 834, 837-838 [43 Cal.Rptr.
865].) Of course, if there was no jurisdiction to entertain the
motion, it cannot be said that the court's reconsideration of
the evidence under proper guidelines cleansed the record of
the previous error. Had the motion been granted or the degree
of the crime reduced, the People would have been assured a

---

[11]"The Court has the power to go further, of course, and since the
*Connelly* [*sic*] Case and since the *Gorshen* Case, the Court has the power,
even though it is not categorized or pigeonholed under Section 192, that
is to say, the particular homicide may not fit the statutory definitions
contained in Section 192, that since the adoption of the diminished
responsibility rule, we deem in effect the necessity for ameliorating the
*McNaughton* [*sic*] Rule to permit us to read into Section 192 in non-
felony murder [*sic*] cases, the matter of post-construction and interpre-
tation of the offense by reason of the diminished responsibility, to man-
slaughter, despite the fact the statute doesn't have it. If you read the
strict words of the statute, you can't find a definition of manslaughter
that is applicable to the case but we deem the statute does amount to
that."

750

successful appeal. (*People* v. *Martin, supra*; Pen. Code, § 1238, subd. 3.)

Further, even if the court had jurisdiction to entertain the renewed motion, the record demonstrates that it continued to entertain certain views with respect to the rule of diminished capacity which, we think, are wrong.

During further discussions the court made the following statements: ". . . [W]hen we adopt the diminished responsibility rule to reduce it to two from one, I think we are being very progressive. We are going along and we shouldn't lose sight of this fact that we are going along with the concept of the diminished responsibility. . . . *But diminished responsibility doesn't mean no responsibility. It means partial responsibility.* It means a lesser responsibility but not as one counsel urged in a homicide case before me, why, I can even find an acquittal under the circumstances. Not under diminished responsibility. . . . However, we are getting into a philosophical discussion. The thought occurs to me that we do have a problem in this particular case and that is a societal problem. What is the responsibility of the Court? Mr. Moore, afflicted as he is unfortunately with this mental pressure, what is society's right in the face of the advanced theory of responsibility? The unexplained act here. *Something that we hope to avoid by some structuring of a more permanent, more lengthy,* rather, degree than just the temporary admission until a remission appears and then society again is at the mercy of him. We can't in all conscience balance legally the theory of diminished responsibility in any other light than the fact that society, in the face of that concept, which is advanced as you say and which I am ready to go along with and I do go along with, but society is entitled to some consideration for these premises. . . ." (Italics added.)

These remarks indicate, we believe, misconceptions concerning the role of the court during the guilt phase of a trial in general and the nature of the rule of diminished capacity in particular.

■ It is fundamental that the trier of fact, be it court or jury, must not consider the subject of penalty or punishment in arriving at its decision of guilt or innocence. We so instruct our juries. (CALJIC 9, 9-A (revised); *People* v. *Shannon,* 147 Cal.App.2d 300, 306 [305 P.2d 101].) In particular, it has repeatedly been held misconduct for prosecutors to urge jurors to find defendants to have been sane because they should be in prison and not in a hospital or "on the

street." (*People* v. *Sorenson*, 231 Cal.App.2d 88, 91-92 [41 Cal.Rptr. 657] and cases cited therein.)

It seems inescapable from the quoted remarks that at least one of the reasons why the court refused to reduce the degree of crime to manslaughter was its belief that society needed protection from defendant by "a more permanent, more lengthy" period of confinement.[12]

The "structure" of a more lengthy confinement of which the court spoke, should be left to the Adult Authority which, after all, can keep a person convicted of manslaughter in prison for a longer period than the minimum imprisonment—before parole—for first degree murder. (Pen. Code, § 3046.)[13] Further, even after a person convicted of manslaughter has served his full term, the provisions of sections 2960 et seq of the Penal Code are designed to keep him indefinitely off the street if, by reason of continued insanity, he still represents a danger to society.

The court's particular misconception of the rule of diminished capacity is closely interwoven with the error just discussed and appears to be this: the court seems to have thought of the rule as one of mercy toward persons convicted of crime who are not quite "responsible." Thus, while it recognized that the means of exercising that mercy is a reduction of the degree of the crime, it is still the exercise of mercy. From this view it follows quite logically that the interest of society in protection is a legitimate factor which the court should take into consideration in deciding just how merciful it should be.

As we read the cases this is an erroneous view. There is certainly nothing in the two earliest cases on the subject, *People* v. *Wells*, 33 Cal.2d 330 [202 P.2d 53] and *People* v.

---

[12]It is noted that in 1965 the maximum state prison sentence for manslaughter was raised from 10 to 15 years. (Stats. 1965, ch. 1271, § 1.)

[13]If confinement is deemed to include custody in mental institutions, it certainly does not follow that enlightened views of criminal responsibility automatically translate into shorter periods during which society is physically protected from mentally sick criminals. It is a well-known fact that in the District of Columbia, after the adoption of the so-called Durham Rule (*Durham* v. *United States*, 214 F.2d 862 [94 App.D.C. 228, 45 A.L.R.2d 1430];, misdemeanants who would have spent a relatively short time in jail under M'Naughton, were effectively deprived of their freedom by psychiatric commitments of longer durations because they were found not guilty by reason of insanity—sometimes on evidence introduced by the prosecution. (See discussion in the First Report of the Special Commissions on Insanity and Criminal Offenders (1962), p. 80; cf. *Lynch* v. *Overholser*, 369 U.S. 705 [8 L.Ed.2d 211, 82 S.Ct. 1063].)

*Gorshen,* 51 Cal.2d 716 [336 P.2d 492], to support it. Each purports to lay down nothing but a rule of relevance. ■ A defendant must be permitted to raise all reasonable doubts concerning every element of the crime with which he is charged.[14] When one of those elements happens to be a specific mental state, evidence that for one reason or another—intoxication, trauma or disease—the defendant did not have such specific mental state, must be admitted. If it raises a reasonable doubt in the mind of the trier of fact the defendant cannot be convicted of a crime of which the particular mental state is an essential element. He is, in the eyes of the law, not partially, but totally unresponsible for that crime. This is not an act of mercy at all but simply an application of the law to the facts.

The First Report of the Special Commissions on Insanity and Criminal Offenders (1962) says: "The rule of the *Wells* and *Gorshen* decisions is sometimes inaccurately referred to as a rule of 'partial insanity' or 'partial responsibility.' This way of describing the rule is inaccurate because the question is not whether the defendant is or is not responsible; the question is whether he had the mental state that is an essential element of the crime charged. Voluntary intoxication does not make a defendant unaccountable under the criminal law, but it may show that he did not have the intent required for the crime of which he is accused. The *Wells-Gorshen* rule is simply an application of that principle to the situation where it is the defendant's mental condition rather than his state of intoxication that renders him incapable of forming the required intent or possessing the required mental state." (*Ibid.,* p. 29.) This report was cited with approval by our Supreme Court in *People* v. *Anderson,* 63 Cal.2d 351, 364, footnote 7 [46 Cal.Rptr. 763, 406 P.2d 43].

■ The application of the rule of diminished capacity is a fact finding process and nothing more. As we indicate in other portions of this opinion, had the trial court, acting strictly in its capacity as a trier of fact, found that Doctor Fauul's

---

[14]*People* v. *Wells,* 33 Cal.2d 330, 346 [202 P.2d 53]: ". . . to preclude the defendant absolutely and at all stages from meeting proof of an element of guilt adduced by the prosecution, cannot be sustained." *People* v. *Gorshen,* 51 Cal.2d 716, 726 [336 P.2d 492]: "Dr. Diamond's testimony was properly received in accord with the holding of *People* v. *Wells* (1949) 33 Cal.2d 330, 346-357 [202 P.2d 53], that on the trial of the issues raised by a plea of not guilty to ·a charge of a crime which requires proof of a specific mental state, competent evidence that because of mental abnormality not amounting to legal insanity defendant did not possess the essential specific mental state is admissible."

testimony did not raise a reasonable doubt, there would be little we could do. As it was, however, when the court found defendant guilty of murder it thought that its options were limited by the statutory definition of manslaughter. At the renewed motion for a new trial it adulterated a fact finding function with extraneous notions not relevant at that stage.

Nothing we have said should put us in disagreement with the trial court's views that society's right to protection is a vital consideration. As we have shown the Legislature has not been insensitive to that need, but the way to achieve that protection is by the utilization of appropriate statutory procedures, not by the application of an emasculated version of the rule of diminished capacity.

The judgment must therefore be reversed.

Defendant raises certain other points which we will discuss only to the extent that they have not become academic by this opinion.

One of the physicians whose written report was offered in evidence apparently based his opinion, in small part at least, on certain statements which the defendant had made after his arrest and which were contained in the transcript of the preliminary examination held in 1964. Upon proper objection by defense counsel the statements were stricken but the doctor's report was not.

There was nothing in the transcript of the preliminary hearing which did not find its way into the record through the testimony of Doctor Fantl, given before the particular psychiatrist's report was received. Therefore, if there was any error, it was entirely harmless.

Defendant also argues that it violates several provisions of the United States Constitution to keep a mentally sick person "in a cold prison cell instead of a hospital." No authorities are cited. *People* v. *Wolff*, 61 Cal.2d 795, 823 [40 Cal.Rptr. 271, 394 P.2d 959] seems directly contra. (See also Pen. Code, § 6102.)

Finally we are urged that the evidence demonstrates legal insanity as a matter of law. Although the evidence of legal sanity is extremely weak, consisting as it does of Doctor Tatunjian's and Doctor Abe's unsworn reports, it is not unsubstantial.

The judgment is reversed.

Hufstedler, J., and Stephens, J., concurred.

A petition for a rehearing was denied February 2, 1968.