Filed 6/30/21  P. v. Rojas CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ARMANDO FLORES ROJAS,<br><br>    Defendant and Appellant. | D076643<br><br><br>(Super. Ct. No. SCS300326) |

APPEAL from a judgment of the Superior Court of San Diego County, Garry Haehnle, Judge.  Affirmed.

Britton Donaldson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorneys General, Charles C. Raglan and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

Armando Flores Rojas challenges his conviction for importing a controlled substance after nearly four kilograms of cocaine was found hidden inside his truck. He contends that comments made by both the prosecutor and the court prejudiced his trial. We reject his arguments and affirm the judgment, finding little in the record to substantiate his claim of error, and even less to support his assertion of prejudice.

FACTUAL AND PROCEDURAL BACKGROUND

While attempting to cross from Mexico into the United States in the early morning hours, Rojas was stopped by border patrol agents after one of their trained dogs alerted to his Dodge Ram truck. Agents initially recovered two packages from Rojas's vehicle that turned out to contain cocaine. Subsequent searches of the truck yielded more cocaine. In all, almost four kilograms was discovered hidden in different areas within the cab of the truck, including underneath the dashboard, near the steering column and under the rear mounting brackets of the car seats.

Rojas owned the truck, and he indicated no one else had done work on his vehicle. The cocaine was packaged in a cellophane material that had been slathered in a black, greasy substance and wrapped along with "Little Trees" air fresheners. These same air fresheners were found elsewhere in Rojas's car. His hands were also streaked with black grease.

The San Diego County District Attorney charged Rojas with three felony counts: (1) importation of over one kilogram of cocaine (Health & Saf. Code, § 11352, subdivision (a)), (2) possession of over one kilogram of cocaine for sale (Health & Saf. Code, § 11351), and (3) using a false compartment to smuggle drugs (Health & Saf. Code, § 11366.8), along with some additional allegations.

2

At Rojas's trial, the primary contested issue was whether Rojas knew about the cocaine in his truck. The prosecution offered significant circumstantial evidence that he did, including recorded conversations between Rojas and his girlfriend, Lydia Ochoa, indicating that Rojas was in the drug business.[1] Julian Villagomez, an expert who reviewed the calls and testified for the prosecution, thought Rojas was coaching Ochoa to continue selling cocaine while he was in jail. Although they used the terminology of "screws" and "boxes of screws," to discuss their product, in the expert's opinion this was a thinly veiled reference to narcotics. The "screws" were sold for $600 per box, and in quantities corresponding to weights often used in drug sales—28 grams per ounce.

Other details from the calls supported this interpretation. In one call, Ochoa told Rojas she was carrying something in her socks and had flushed it. Rojas also repeatedly told Ochoa to be careful, and although some of these admonitions might have been on account of Ochoa's recent pregnancy, Villagomez thought Rojas was concerned Ochoa could get hurt or ripped off by a client during a sale, particularly because she was a woman. He also opined that Ochoa became increasingly comfortable over time with her new role, and even began making her own decisions about how to deal with customers. All of this led Villagomez to conclude that both Rojas and Ochoa were "very actively involved in the sales and distribution of narcotics."

In addition to the phone calls, the prosecution submitted and compared Rojas and Ochoa's recent border crossing histories. In the six months leading up to Rojas's arrest, he crossed the border in his Dodge truck 55 times. During that same period, Ochoa's crossing history showed a strong pattern:

---

[1] These recordings were from both Rojas's jail calls and in-person visitation.

most of the time, she crossed as a pedestrian around the same time that Rojas was crossing in the Dodge. This indicated that Rojas and Ochoa were actually crossing together, but that Ochoa left the truck temporarily and walked across the border to distance herself from the Dodge and, presumably, the controlled substance it carried—a "common technique" in drug smuggling.

The defense provided an alternative theory that Rojas was the victim of unknown drug smugglers who used him to get their product across an international border. As to the other evidence, the defense generally sought to undermine the People's witnesses and suggested innocent explanations for Rojas's conduct.

Rojas was convicted on count one, for importing cocaine, but on the other two counts—possession of cocaine for sale and using a false compartment to smuggle drugs—the jury deadlocked 11–1 in favor of guilt. The court declared a mistrial as to those counts and granted the People's subsequent motion to dismiss.

DISCUSSION

Rojas raises two issues on appeal, claiming (1) that certain remarks made by the prosecutor in closing argument diluted the People's burden of proof, and (2) that comments the trial judge made during voir dire about collaborative courts impermissibly invited the jury to consider punishment in determining guilt. As we explain below, we find no prejudicial error in either instance.

1. *Closing Argument*

Rojas asserts that the prosecutor's closing argument misled the jury by conflating a reasonable inference with the reasonable doubt standard and referencing the philosophical principle of Occam's razor in his rebuttal. We

4

address each of these contentions, but ultimately find no prejudice. Most of the prosecutor's argument was proper, and Rojas fails to demonstrate that the only truly questionable comment created a reasonable likelihood that the jury misapplied the reasonable doubt standard.[2]

Since the primary issue was whether Rojas knew about the cocaine, the prosecutor focused his closing argument on the knowledge element in counts one and two,[3] highlighting the circumstantial evidence that tended to show Rojas was aware of the drugs. He went over Rojas's jails calls and argued these communications showed that Rojas was "actually and actively selling and moving drugs." He recounted Rojas's border crossing history with Ochoa, which tended to show they both knew there were drugs in the truck. He further reminded the jury that there was black grease found on both the packages and the defendant's hands, arguing that "in this particular case, the grease quite literally puts the drugs in defendant's hands just prior to crossing the border."

Beyond all of this, the prosecutor critiqued the defense's theory of the case by walking through the steps that hypothetical criminals who hid the cocaine in Rojas's car without his knowledge would have had to do. Specifically, they would have had to break into Rojas's car multiple times without being seen to identify good hiding places for the drugs, modify the cab, stuff the various compartments, and put everything back together inconspicuously. Then they would have had to track Rojas and wait for

---

[2]    In recognition that his defense counsel did not timely object, Rojas also raises an ineffective assistance of counsel claim, which we need not reach since we conclude he was not prejudiced.

[3]    Both crimes require the prosecution to prove the defendant knew about the presence of the controlled substance. (CALCRIM Nos. 2300 and 2302.)

another opportunity to break into his car again to recover their product. The prosecutor argued that this theory was not a reasonable interpretation of the evidence.

Contrary to Rojas's assertions, these comments—which account for most of the prosecutor's references to "reasonableness"—were proper. "Advocates are given significant leeway in discussing the legal and factual merits of a case during argument" (*People v. Centeno* (2014) 60 Cal.4th 659, 666 (*Centeno*)), and it is permissible for a prosecutor "to argue that the jury may reject impossible or unreasonable interpretations of the evidence and to so characterize a defense theory." (*Id.* at p. 672.) The prosecutor was well within permissible bounds in arguing that the defense theory was not reasonable, and that the jury should look at the evidence in aggregate. (*Ibid.*)

But one of the prosecutor's statements about reasonableness falls somewhat outside these permissible bounds. After arguing (as an analogue to the defendant's car) that it was certainly reasonable to infer the prosecutor knew the contents of his own briefcase, he went on to say, "But even if we stopped right there, you could find beyond reasonable doubt, reasonable, that [Rojas] knew the drugs were there. You could. That is reasonable. It is common sense. It is common sense right there."

The problem with this statement is the potential conflation of the reasonable doubt standard with a common sense inference. Prosecutors may not make statements that could be interpreted by the jury as reducing their burden to prove each element of the charged crimes beyond a reasonable doubt. (*Centeno, supra,* 60 Cal.4th at p. 666.) And "it is error for the prosecutor to suggest that a 'reasonable' account of the evidence satisfies the prosecutor's burden of proof." (*Id.* at p. 672.) Although this might have been no more than an attempt to explain how circumstantial evidence can satisfy

6

the reasonable doubt standard, the prosecutor's invocation of "common sense" at the same time as "reasonable doubt" risked blurring the line between these two concepts.[4]

Rojas likens his case to one of the errors identified in *Centeno, supra,* 60 Cal.4th 659, where the prosecutor's extensive remarks on reasonableness—in which she repeatedly asked the jury if it was *more* reasonable to believe the defendant or the victim as to various aspects of the case—"left the jury with the impression that so long as her interpretation of the evidence was reasonable, the People had met their burden." (*Id.* at p. 672.) Here, in contrast, almost all the prosecutor's comments on reasonableness were confined to characterizing the defense's theory as unreasonable—a tactic explicitly approved in *Centeno.* (*Ibid.*) And unlike in *Centeno*, here there was no climactic syllogism urging the jury to conclude the defendant was "good for" the charged crimes because "that is what is reasonable." (*Ibid.*) Another case Rojas invokes, *People v. Ellison* (2011) 196 Cal.App.4th 1342, 1352 (*Ellison*) is similarly inapt; there, the prosecutor argued more than once that the reasonable doubt standard was satisfied unless it was reasonable to believe the defendant was innocent. That was a clear misstatement of the law, but not akin to the argument here.

Returning to the most problematic statement in this case, even if we were to deem it an error, it is nonetheless harmless unless the defendant demonstrates prejudice. To do so, he must show that, taken in the context of the argument and jury instructions as a whole, "there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an

---

4    In evaluating prosecutorial error, the intent of the prosecutor is irrelevant. (*People v. Hill* (1998) 17 Cal.4th 800, 822–823.)

improper or erroneous manner.' " (*Centeno, supra,* 60 Cal.4th at p. 667.) And reviewing courts " 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*Ibid.*) In other cases that weigh prejudice in the wake of prosecutorial error, the severity of the error is considered, along with whether the jury was correctly instructed on the law, whether the court admonished the jury to disregard improper statements, whether defense counsel objected, and the strength of the evidence against the defendant. (*Id.* at p. 676; see also *People v. Otero* (2012) 210 Cal.App.4th 865, 873 [the court's admonishment that the jury disregard improper argument, coupled with proper instruction on reasonable doubt and a strong case against the defendant rendered prosecutor's error harmless]; *People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1269 [same]; *People v. Mendoza* (2007) 42 Cal.4th 686, 703 [court's admonishment and correct statement of the law cured the prosecutor's misstatement].)

Here, there was no objection or admonition. Those factors weigh in Rojas's favor. But every other relevant consideration does not. The jury was formally instructed twice on the reasonable doubt standard and reminded of it no less than seven times before closing arguments. During the prosecutor's closing argument, he reminded the jury of his burden on another three occasions, stating twice that he had to prove each element of the charged crimes beyond a reasonable doubt. In addition to these reminders, the jury was also instructed to follow the law as the judge explained it and to do so even if a statement by the attorneys conflicted with their instructions.

Apart from these correct statements of the law and reminders, other relevant considerations indicate the jury understood and applied the reasonable doubt standard properly. The jury deadlocked on two of the three

8

counts charged, coming to a consensus that Rojas *imported* more than one kilogram of cocaine, but not that he possessed that amount in order to sell it or that he used a false compartment to smuggle drugs. This result alone indicates that the jury deliberated on the individual elements of the crimes rather than jumping to an undifferentiated conclusion. (See *Ellison, supra*, 196 Cal.App.4th at p. 1353 [the jury's acquittal of the defendant on some counts demonstrated "that it understood the applicable burden of proof as it was instructed, and applied it to the defendant's advantage"].) It also sent a note asking whether possession of more than one kilogram of cocaine implies an intent to sell under the law, which indicates that the jury grappled with the extent to which the volume of cocaine in Rojas's car provided circumstantial evidence that he planned to sell it. All of this points to a discerning and critical jury focused on its proper task. Coupled with the strong evidence presented against Rojas, it is not reasonably likely that the prosecutor's statement obfuscated the reasonable doubt standard and caused the jury to misapply it. On this record, we find no reason to depart from the "ordinary" conclusion that the jury followed the court's instructions as to the law and disregarded any improper standard implied by the prosecutor. (*People v. Osband* (1996) 13 Cal.4th 622, 717.)

The other comment that Rojas highlights is the prosecutor's invocation of Occam's razor in his rebuttal. He stated as follows: "In cases like this, I like to think of a theory known as Occam's razor. I don't know if anyone has heard of it. But Occam's razor is a principle from philosophy. And Occam's razor says this: All things being equal, the simplest answer is usually the correct one. [¶] And when we look at the facts and the evidence here, you can come up with a million explanations for any piece of evidence, right. A million innocent explanations. [¶] But when you look at the totality of the

9

circumstances, all things being equal, the simplest answer is that this defendant, in his truck with the compartments with the drugs, is the one that knew that the drugs were there."

Taken in context, this commentary did not, as Rojas suggests, dilute the People's burden. The prosecutor was responding to the defense's closing, in which defense counsel argued one point above all—that there was reasonable doubt as to whether Rojas knew the drugs were there. In support of the unwitting drug mule theory, she argued that a network of drug smugglers could have observed Rojas's border crossing patterns over time, broken into his truck relatively quickly, and stashed cocaine inside of it without detection. She further asserted that the changes to the truck were not very obvious and that unreported crimes are ubiquitous south of the border, where drug smugglers hardly balk at committing additional lawless acts in service of their primary criminal enterprise.

The prosecutor's reference to Occam's razor was a counterpoint to all of this, illustrating that the *simplest* explanation for the presence of the cocaine in Rojas's car was that he knew about it because he put it there. And although the prosecutor stated the primary thrust of the principle—that the simplest explanation is usually the correct one—he did not on that basis alone urge the jury to convict, or otherwise muddle the standard of proof. In fact, immediately following this comment, he explained that it is possible for people to not be aware of items in their own car, but implied it is more likely to happen to someone like an Uber driver or result in the discovery of an errant cracker—not four kilograms of cocaine. In total, his invocation of Occam's razor did no more than illustrate that the defense theory was less

than reasonable.[5]  As we previously explained, such argument is entirely permissible.[6]  (*Centeno, supra*, 60 Cal.4th at p. 672.)

2.      *Commentary on Collaborative Courts*

In order to understand the comments the trial judge made about collaborative courts, it is helpful to first know the context.  During voir dire, no less than four potential jurors related difficult experiences with the criminal justice system and/or expressed, to varying degrees, their hesitance to be part of a jury.  One prospective juror described a prior jury experience in which they felt rushed to return a verdict.  This same individual taught at a prison and a juvenile facility, and expressed a desire to "bring people out of prison" rather than being a part of "putting them in."[7]  This teacher also disclosed that a student was brutally assaulted in prison and nothing was done about it.

A second prospective juror described their spouse's prior jury service in a case where the police, acting on a bad tip, went to the wrong house and shot an innocent person—and then spent significant energy "covering . . . each other's backs" for the mistake.  A third prospective juror simply expressed,

---

[5]      For an example of similar use, see *People v. Pope* (Ill.Ct.App. 2020) 157 N.E.3d 1055, 1069, where the prosecutor's reference to Occam's razor to demonstrate that "the defendant's explanation required the jury to assume 'everyone [else] is lying' " was deemed proper.

[6]      This is not to approve the use of a concept like Occam's razor for any purpose in any closing argument.  "[T]inkering with the explanation of reasonable doubt is a voyage to be embarked upon with great care" (*Centeno, supra*, 60 Cal.4th at p. 671), and this is no less true of philosophical principles than of visual aids.

[7]      In response to this comment, the court clarified, "that is not for you to decide whether or not they are going in.  That would be a decision I make, whether or not the defendant goes to prison or not."

11

"I have opinions about the justice system and about the court system. I haven't been living under a rock for the last 25 years. So it's kind of questionable whether I can be a fair and impartial juror at this point." A fourth prospective juror relayed a personal experience with a drug conviction about twenty years ago, saying these previous addiction issues were "horrible" and that going through the legal system caused additional pain.

After the attorneys finished questioning the prospective jurors, the court paused to respond to these comments and offered the following perspective:

> "Before I begin and thank and excuse some jurors, I want to take this moment . . . . I really want to apologize for those people who, through themselves or through people they know or through other members of the community, feel like the justice system and the court system has let them down or is not doing what it should be doing, and I want to apologize to you. . . . [¶] Justice doesn't necessarily mean guilty verdicts and stiff sentences. [¶] The word 'sentence' over the years has come to a meaning of something negative. Here in California, especially here in San Diego, we have a number of collaborative courts. Those are courts that work with members of the community to deal with veterans' issues, mental health issues, drug addiction . . . . [¶] And in those courts, the people that are assigned to those courts make it through those once they have been convicted, but part of their sentence is the treatment program. It's not a punishment. It's not a sentence to prison. It's a treatment program. [¶] If they finish those treatment programs successfully and prove that they can be valued members of our community, they get some of their cases dismissed because of that, if the case is more due to their mental health or due to their drug addiction or due to mental health indications that they suffered when they were in battle or through the military. [¶] So I just want to put out to you that we are working on the court system very hard, and we're trying to make sure it gets

better and better every day.  [¶]  And just for those of you who may have been taken aback by it, I just want to apologize and let you know we are working as hard as we can to be about that.  So I just wanted to put that out there."

Although she made no objection at the time, a few days later Rojas's attorney expressed her concern to the court that a juror might interpret its comments to mean Rojas could be sentenced to drug court and take convicting him less seriously as a result.  In response, the court promised it would address the issue and make sure the jury was "very clear" that, in the event of a guilty verdict, "whatever becomes of Mr. Rojas is totally up to me, and they are not to take that into consideration one way or the other."

At the end of the trial, the court instructed the jury to "reach your verdict without any consideration of punishment"  and elaborated, "Ladies and gentlemen, when I talk to you about reaching your verdict without any consideration of punishment, that goes all ways.  Whether or not he is going to be eligible for any programs I told you about or whether or not he is going to go to prison, that is for me to decide and is outside of your purview.  Your job only is to decide whether the evidence has convinced you beyond a reasonable doubt that the defendant is guilty."

The defense expressed no further concerns after this clarification, but on appeal Rojas now takes the position that the court only deepened the damage from its earlier comments by bringing up collaborative courts a

13

second time.[8]  He argues that the trial court erred by "failing to tell the jury NOT to consider punishment" and points to the jury's vote split and the nature of the counts as evidence of prejudice.  Putting aside the question of whether this issue was even preserved, as is our purview (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6), we disagree with Rojas on both points.

He is certainly correct that punishment is an impermissible consideration for juries.  (*People v. Mendoza* (1974) 37 Cal.App.3d 717, 727; *People v. Moore* (1968) 257 Cal.App.2d 740, 750.)  But we do not share his view of what was communicated during the final jury instructions, nor his assessment of prejudice.  Regarding the first issue, the trial judge *did* tell the jury not to consider punishment.  He did this precisely when he instructed them to reach their verdict without any consideration of punishment.  He then reiterated the point when he told the jury Rojas's punishment was "for me to decide" and "outside of your purview."  As a final word on the matter, he directed them to focus on their only task:  determining guilt using the reasonable doubt standard.  We presume the jurors understood and followed these instructions.  (*People v. Delgado* (1993) 5 Cal.4th 312, 331.)

As to prejudice, Rojas contends that the only charge he was convicted of, importation, is a crime relating to addiction; he characterizes the other counts—possession for sale and use of a hidden compartment—as related to

_____

8    We find this reasoning dubious for two reasons.  First, the judge addressed his earlier comments at the request of defense counsel, which rather lessens the force of Rojas's complaint.  (See, e.g., *People v. Payton* (1992) 3 Cal.4th 1050, 1068 [disfavoring appellate argument that the court should have answered a jury note regarding a factual matter where defense counsel asked the court not to respond].)  Second, we are hard pressed to see how a corrective comment directing the jurors not to consider Rojas's postconviction fate in their deliberations would prompt them to do exactly that.

the business of selling drugs. And because the jury deadlocked on the latter two crimes with an 11–1 split favoring guilt, he suggests there was a single holdout juror who viewed this case as fundamentally driven by Rojas's addiction. That juror, as Rojas tells it, might have been encouraged by the court's comments to convict on what he characterizes as the addiction-related count, thinking Rojas could then receive treatment for his problem in a collaborative court setting.

This rather creative framing of the case does not withstand scrutiny. Someone who is caught importing almost four kilograms of cocaine is not merely dogged by the personal demon of addiction. Nor could the jury be under that illusion. In addition to all of the evidence indicating Rojas regularly imported and sold large quantities of a controlled substance, the People also presented testimony about the business of drug distribution, including an explanation that "users" usually purchase "street level small amounts [for] personal use because of their addiction" that consist of "gram or half-gram" weights. A supply of drugs in the higher volume of ounces or even quarter pounds occurs upstream in the supply chain, eventually reaching "[k]ilogram levels." The clear import of this testimony was that someone in possession of kilograms of cocaine is much more than a user.

Returning to our analysis, we assess possible prejudice in light of "the magnitude of the error and the closeness of the case." (*People v. Vasquez* (2017) 14 Cal.App.5th 1019, 1041.) The error here, if any, was minimal. The court's comments about improving the legal system every day, and offering treatment to those who need it, were clearly a response to the prospective jurors who voiced their negative experiences with the court and prison systems. We believe anyone who was present for that exchange would have understood that the court was apologizing to these potential jurors and

offering a perspective that might restore some of their faith in the fairness of the criminal process. It could hardly have been taken as an invitation for jurors to consider sending Rojas to a treatment program by convicting him for that purpose. And insofar as the comments could have planted that idea in a juror's mind, the court explicitly instructed the jurors right before they deliberated to put away any such notions and focus on their proper role of deciding whether Rojas violated the law.

As to the weight of the evidence, this case was not a close one. There was overwhelming circumstantial evidence that Rojas knew about the cocaine. Rojas and Ochoa's border crossing histories and jail communications alone provided compelling evidence that Rojas was not an unwitting mule. The grease on his hands and the unlikelihood that someone else could have packed his car with cocaine without his knowledge only strengthened the People's case. To that end, the jury's deadlock on two of the three counts is curious, but it seems that only one juror was unconvinced of Rojas's guilt on all three counts. We do not infer from that single juror's position that this case was a close one.

Given the minimal (if any) mistake by the trial court, the strong case against Rojas, and the almost fantastical series of events that would have had to take place for the court's comments to result in an erroneous conviction, we find no prejudice here even under the most stringent standard. (See *Chapman v. California* (1967) 386 U.S. 18, 24.) There is no nontrivial possibility that the court's comments during voir dire inspired the holdout juror to disregard all the other instructions as to reasonable doubt, the court's own curative attempt, and their role as a juror in order to indirectly send Rojas to a treatment program via a felony conviction. We find "no indication

16

from the record that the trial court's [comments] had such an effect." (*People v. Jackson* (1986) 177 Cal.App.3d 708, 714.)

DISPOSITION

The judgment is affirmed.

DATO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


IRION, J.