KAUS, P. J.
 

 Defendant killed his wife Marcile with a target pistol in the early hours of July 5, 1965. He pleaded “not guilty. ’’ There was no plea of “not guilty by reason of insanity.” After a jury trial in which he was represented by private counsel he was found guilty of murder in the second degree.
 

 Three issues are involved in this appeal:
 

 1. Was the jury adequately instructed on the subject of diminished capacity ?
 

 2. Did the evidence show, as a matter of law, that the most serious crime of which defendant was guilty is manslaughter?
 

 3. Was a certain exhibit offered by defendant improperly excluded ?
 

 We have reached the conclusion that the instructions to the jury were fatally defective in view of the issues raised at the trial, but that we cannot say that the evidence, as a matter of law, compels a reduction to manslaughter.
 

 Since there must be a retrial, we need not decide whether the exhibit in question was properly rejected at the first trial,
 
 *677
 
 but only what the criteria of admissibility will be when the case is retried under the provisions of the Evidence Code.
 

 Facts
 

 Defendant and his wife were married in 1955. Their marital life was uneventful until she became pregnant in 1963. While pregnant she developed habits which defendant wrote off as peculiarities due to her state. Twins were born in December of 1963.
 

 Both defendant and his wife were professional people. He was an engineer. She was a mathematician employed at Hughes on the Syn-Com project. Disagreements concerning the upbringing of the twins developed. In early 1964 the wife started to drink alone. Normal marital relations dropped to "essentially zero.” She would not go out with him in the evening, although the Farrs had an Irish maid, Vera Gregory, as a " built-in babysitter of very high standards. ’ ’ On December 31, 1964, a wedding anniversary, Marcile did not buy defendant the customary present. Early in 1965 she told him that she did not love him anymore. In April of 1965 she went east for the launching of the Com-Sat satellite. After her return she once returned home at 3 a.m. "three-quarters drunk. ’ ’ An argument followed a few days later. She accused him of being dull, said she was not meant for married life and perhaps wanted a divorce. She suggested a separation. Defendant suggested a truce until Marcile’s mother, who was visiting, had left. Near the end of May, Marcile said that she was thinking of being unfaithful. He asked her not to, but she was noncommital. At that time she was 39 years old, defendant 36.
 

 On June 1 Marcile told defendant that she had decided against being unfaithful. About a week later defendant moved into an apartment. Three days later there was a telephone conversation between defendant and Marcile during which he read her certain passages of the document the admissibility of which is one of the issues in this appeal. The next day, June 11 defendant parked his ear outside of the family home. When he left at about midnight Marcile had not arrived home from what was supposed to be a business meeting.
 

 On the morning of Sunday, June 13 Marcile told him that she had been unfaithful. That day she and defendant agreed to go and visit a psychiatrist. They made one joint visit. Defendant did not know how many times Marcile went thereafter; he himself had about six consultations. On June 17
 
 *678
 
 defendant moved back into the home, without, however, giving up his apartment.
 

 On June 21 there occurred an event concerning which the record discloses two slightly different versions. According to Vera Gregory, after a conversation between her, Mareile and defendant in the living room, defendant entered Vera’s bedroom where she was sleeping with a girl friend. He was upset. He looked angry. He told her he hated her. “He was talking about a divorce of his wife and something. If she should give him a divorce, he would kill her; something like this.” The next day Vera left the Farr household.
 

 Defendant’s version of the incident was that he said to Vera that he was going to divorce his wife or kill her. At that time he had had quite a few drinks.
 

 After the incident in Vera’s bedroom defendant picked up the target pistol with which, a few days later, he shot his wife. He contemplated shooting himself with it, but decided to flip a coin. The coin came up “tails” and he merely fired the gun into the air. His wife then came into the room and talked him into putting the pistol away.
 

 On July 1 defendant and his wife had another conversation about her infidelity. He threatened to find out the name of the man involved and she replied “. . . never mind. Next time it will probably be a different man anyway. ’ ’
 

 On July 4, 1965, defendant and Mareile drank a large amount of beer during the afternoon. At the dinner he had pancakes soaked in Cointreau. He drank three snifters of Metaxa after dinner.
 

 Defendant and Mareile then had a conversation about their marriage during which she made the statement: “Well, at least I know I’m not frigid any more.” She then insisted that she wanted a divorce. She went into the bathroom and closed the door. He either ran into or fell against the door and broke two of his ribs. He then struck the door deliberately with his fist. He suddenly developed tunnel vision. He started to have difficulty breathing. Mareile left the house. She had trouble starting her ear. Defendant hit one of the car windows with his fist and shattered the glass. She backed out and left.
 

 Defendant reentered the house. “All the problems seemed to pile up, and the—they pushed me down a tube or state of falling in which—oh, utter despair; no other emotion; just flat, plain; utter failure. ...” He wrote a note which he calls a suicide note. It reads: “To a fucking Hore Wife I love you. ’ ’ He picked up the target pistol and placed one bullet in
 
 *679
 
 it. He made a telephone call to the home of Mr. and Mrs. Getting. The telephone was answered by Mrs. Getting, who was married to Marcile’s brother.
 

 According to Mrs. Getting defendant said that he was going to kill his wife and himself. She asked Mm whether he had been drinking and he said “yes.” He repeated: “I’m going to kill her, and then I’m going to kill myself.” He hung up.
 

 According to defendant he merely told Mrs. Getting that he was going to shoot Mmself and that she should come after the children. He may have added a remark such as “Maybe the harlot is with her boy friend. ’ ’
 

 He then heard a noise and found that Marcile had returned to the home. He asked her what she was doing. She said that she had come back to protect the children from him. At that time he “must have” had a gun in his hand. In his mind was the question “Why? Was it this? Or was it just to get the children away from me?” Marcile said “Why don’t you shoot me ? ” At this point the gun went off and she fell backward against a window. Defendant called the police and Mr. Getting. He told Mr. Getting that he had shot Marcile and that he should come for the children. He went back into the bedroom and put another round in the barrel of the pistol in order to commit suicide. At that point he became aware of the fact that Marcile was not dead and called for an ambulance.
 

 Defendant maintained that at the instant of the shooting he did not intend to take the life of his wife and that he had no recollection of holding up the gun and aiming it. He did recall hearing and seeing the gun and seeing Marcile fall.
 
 [1]
 

 The police and an ambulance arrived shortly thereafter. Marcile was still alive at that time and made a dying declaration identifying defendant as the person who shot her. She said that defendant thought she was going out with another man, that she had asked defendant for a divorce about two months earlier, but had been refused.
 

 Marcile expired several hours after the shooting. The next day defendant, having been advised of his rights, gave a statement to the police. His statement with respect to the moment of shooting was that he “had raised his hand and had discharged the weapon, pointing it in [Marcile’s] direction.”
 
 *680
 
 Asked whether he had aimed the weapon, he said that he did not have to aim. The only reason why he did not take his own life after the shooting was that he noticed signs of life in his wife. His motivation for shooting her was that after she had asked him to shoot “he had given her everything else, so I gave her that. ’ ’
 

 On cross-examination defendant explained his apparently somewhat better recollection of events as given to the police as being a reconstruction of what must have happened.
 

 The only expert witness who testified was Doctor George N. Thompson, a psychiatrist and neurologist who examined defendant on several occasions. He also performed electroencephalograms, one of which was done while defendant was under the influence of alcohol. His significant diagnosis was that defendant suffered from “a mental disorder called a schizoid personality which decompensated into a dissociative state, a schizophrenic dissociative reaction, just prior to the shooting. ...”
 

 A dissociative state was defined by the doctor as follows: “a state in which the mind, one part of the mind, doesn’t know what the other part of the mind knows. The mind is split so that a portion of the mind, the subconscious part of the mind, is acting without the conscious part of the mind knowing what the subconscious part of the mind is thinking or causing the person to do. ’ ’
 
 [2]
 

 The doctor based his conclusion primarily on defendant’s loss of memory: ‘ ‘ Prom a certain point on he has no memory of what occurred. So during that period of time it appears to me that he decompensated into a dissociative state in which his voluntary mind did not actually know what occurred.”
 
 *681
 
 The- doctor' tho-ught that it was the building up of severe mental frustration and mental conflict which plunged defendant into the dissociative state.
 

 The electroencephalograms taken by Doctor Thompson indicated an abnormal brain wave pattern, accentuated by the consumption of alcohol. The doctor said, however, that he could not determine how defendant’s apparent brain damage would affect a man’s behavior. He conducted the eleetroeneephalographic tests in order to determine whether defendant’s amnesia was produced by alcohol. In his opinion that was not the ease.
 

 The telephone call to Mrs. Getting was, in the doctor’s opinion, a symptom of defendant’s mental illness. He found support for his diagnosis in the inconsistency between defendant's recollection concerning what he said and Mrs. Getting’s testimony. It indicated that defendant was breaking down into the dissociative state.
 

 In Doctor Thompson’s opinion defendant did not have any intent to kill.
 

 On cross-examination Doctor Thompson said that he accepted defendant’s statements concerning the events leading up to and following the shooting as true. If in fact defendant did remember shooting his wife, then his opinion with respect to the dissociative state would be no longer valid, but the discrepancy between defendant’s and Mrs. Getting’s versions concerning the telephone call tended to strengthen his diagnosis because it showed that his memory was inaccurate.
 

 On the other hand, while Doctor Thompson thus found positive support for his opinion in the discrepancy, the passage quoted in the footnote
 
 [3]
 
 seems to indicate that in fact he did not accept either defendant’s or Mrs. Getting’s version.
 

 The doctor also admitted that a loss of recollection may be the result of repression after an event, rather than unconsciousness while it happens.
 

 A picture of the deceased was introduced in evidence. It
 
 *682
 
 shows that the bullet entered her nose at a point almost exactly equidistant between the eyes.
 

 Instructions
 

 Defendant requested certain instructions with respect to the defense of diminished capacity. They were refused There is no particular reason for discussing them. The court was under a duly to instruct the jury on the significance of the evidence relating to the issue of diminished capacity sua sponte.
 
 (People
 
 v.
 
 Henderson,
 
 60 Cal.2d 482, 489-490 [35 Cal.Rptr. 77, 386 P.2d 677].)
 
 [4]
 

 The only instruction which was given on the issue of diminished capacity was as follows: ‘1 The defense of mental illness not amounting to legal insanity is a significant issue to be decided by the jury.” While this statement, a partial paraphrase of a sentence in
 
 People
 
 v.
 
 Henderson, supra,
 
 is of course true, the instruction merely directs attention to the fact that diminished capacity “is a significant issue” to be decided by the jury—it gives no clue concerning the legal reason for its significance. There is nothing in the instruction which guides the jury in the manner in which it was to apply a finding of diminished capacity to the elements of the crime charged and the facts of the case.
 

 There is no need for us to prescribe with exactitude just what the jury should have been told. “California Jury Instructions Criminal” (CALJIC) contains at least three standard instructions applicable to eases involving the issue of diminished capacity. (CALJIC 73-B, 303-A and 305.1.)
 
 [5]
 

 The omission of complete instructions is all the more unfortunate, since the jury did not get too much help on the issue of diminished capacity from Dr. Thompson. It is not disputed by the People that his testimony would support a finding of diminished capacity, but the thrust of his opinion seems to have been more in the direction of legal insanity. If the conscious part of the mind does not know “what the subconscious part is thinking and causing the person to do” does such a
 
 *683
 
 person “know the nature and quality of the act”?
 
 (People
 
 v.
 
 Wolff,
 
 61 Cal.2d 795, 800-801 [40 Cal.Rptr. 271, 394 P.2d 959].)
 
 [6]
 

 Reduction to Manslaughter
 

 As our discussion below demonstrates, the evidence, apart from Doctor Thompson’s testimony, supports the verdict.
 
 (Jackson
 
 v.
 
 Superior Court,
 
 62 Cal.2d 521, 525-526 [42 Cal.Rptr. 838, 399 P.2d 374].) If Ms testimony compels a finding of diminished capacity, it would be our duty to consider the legal consequences of such a finding. We do not reach the question, however, because Doctor Thompson’s opiMon does not have to be accepted.
 

 The doctor admitted that one fact essential to the correctness of Ms diagnosis, was loss of memory.
 
 [7]
 
 One can infer from the statement defendant gave to the police that the claimed gap in Ms consciousness was an afterthought. With the foundation for Doctor Thompson’s testimony thus removed, very little remains.
 

 We are fully aware that in a series of recent eases
 
 (People
 
 v.
 
 Goedecke,
 
 65 Cal.2d 850 [56 Cal.Rptr. 625, 423 P.2d 777] ;
 
 People
 
 v.
 
 Nicolaus,
 
 65 Cal.2d 866 [56 Cal.Rptr. 635, 423 P.2d 787];
 
 People
 
 v.
 
 Ford,
 
 65 Cal.2d 41 [52 Cal.Rptr. 228, 416 P.2d 132] ;
 
 People
 
 v.
 
 Wolff,
 
 61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959]) the Supreme Court interpreted psychiatric testimony—split on the issue of insanity in
 
 Goedeche
 
 and Nicolaus—as establishing diminished capacity to premeditate and deliberate
 
 [8]
 
 as a matter of law. In none of the cited cases did it appear that the psychiatric testimony on which the Supreme Court relied was totally dependent on a fact which may well be nonexistent.
 

 We think that defendant’s appointed counsel properly recognizes the inherent weakness of the psychiatric testimony, because his principal reliance is on
 
 People
 
 v.
 
 Bridgehouse,
 
 47 Cal.2d 406 [303 P.2d 1018], a case which did not involve dependence on medical expertise. In
 
 Bridgehouse
 
 the Supreme Court reduced a conviction of second degree murder to manslaughter. Bridgehouse, who happened to be armed, unexpectedly encountered his wife’s lover in the home of his
 
 *684
 
 mother-in-law. He suffered an emotional reaction very similar to that claimed by defendant here. He shot the victim.
 

 We agree with the Attorney General that
 
 Bridgehouse
 
 is distinguishable from the case at bar on the basis of the two threats, particularly the one communicated to Mrs. Getting just before the shooting.
 

 Admissibility op Exhibit “B”
 

 This exhibit is a long memorandum in which defendant goes over his relationship with his wife. The principal mood is love and compassion. If sincere, it belies an intention to take her life.
 

 The only tenable objection to the document would be that it is hearsay. That objection was never made at the first trial. Perhaps it was so obvious to all concerned, that it did not have to be articulated. At the retrial the admissibility of the document will be governed by section 1250 of the Evidence Code. Clearly the statement tends to prove the defendant’s state of mind and emotion not only at the time when it was made but also for a reasonable time thereafter. It can hardly be suggested that where, as here, the trier of fact must attempt to reconstruct the defendant’s state of mind from such data as are available, a document such as this is too remote.
 

 The admissibility will also be subject to the provisions of section 1252 of the Evidence Code, assuming that there will be evidence to indicate its lack of trustworthiness. Our study of the record made at the first trial does not disclose anything of that nature. There is not one scintilla of evidence that defendant was planning the killing of his wife at the time the memorandum was composed.
 

 Such cases as
 
 People
 
 v.
 
 Smith,
 
 15 Cal.2d 640, 648-649 [104 P.2d 510] and
 
 People
 
 v.
 
 Swain,
 
 200 Cal.App.2d 344, 349-351 [19 Cal.Rptr. 403] which flatly reject such evidence as “self-serving” must be deemed no longer valid. Their inflexibility has been replaced by the more elastic standards of section 1252.
 

 The judgment is reversed.
 

 Hufstedler, J., and Stephens, J., concurred.
 

 [1]
 

 To some extent this statement was retracted during cross-examination: “The only thing I remember about hearing that shot go off is seeing her fall through that window, feeling at the time, as I said, as though I had been hit. ’ ’
 

 [2]
 

 The total blackout of the conscious portion of defendant’s mind, described by Doctor Thompson, appears to be different from the condition suffered by the defendant in
 
 People
 
 v.
 
 Ford,
 
 65 Cal.2d 41, 54 [52 Cal.Rptr. 228, 416 P.2d 132]: “On cross-examination Dr. Carleton testified that
 
 ‘
 
 unconsciousness ’ was, in the physical sense, a state of sleep, a comatose state, or a state of immobility. He testified that defendant was not unconscious in that sense; that he was aware to the extent that he was able to perceive with his passive senses; that he could interpret this information in a primitive way, being governed only by underlying emotional motivation. He stated that when defendant saw the two highway patrol cars, his brain received the visual message, but the brain merely interpreted danger and need for escape in order to accomplish his prime emotional goal of reuniting his family. His interpretation of his perceptions was controlled by his particular mental status at that time. Dr. Carleton testified that while, at the time of the homicide, defendant was not unconscious in the medical or physical sense because he was responding to his memory, he was unconscious of the realities of the situation and the realities were not exerting any influence upon him , , .
 

 [3]
 

 "Would you say that that is no indication of his intent of that night, what he said on the phone, assuming its truthfulness? A It may be some indication. It’s very hard for me to form an opinion on that. Q Why is that, sir? A Well, in the first place, he was drinking heavily. His own memory of what he said differs from her statement of what was said, so it’s hard to evaluate it. I don’t know. Q. I’ve asked you, if you would, to assume the truth of the statement, that the words were spoken. Does
 
 *682
 
 that make any difference in what you have said in answer ? A If the words were spoken, I assume that’ it would indicate intent. ...”
 

 [4]
 

 People
 
 v.
 
 Henderson, supra,
 
 also holds that the failure to instruct may, under certain circumstances, be cured by argument of counsel. We have ordered the record in the instant case to be augmented to include defense counsel’s argument. We do not find that this case comes within the rule set forth in
 
 Henderson.
 

 [5]
 

 CALJIC 305.1 was adopted as a response to
 
 People
 
 v.
 
 Conley,
 
 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911], decided after the trial of this case.
 

 [6]
 

 We note again that insanity was not pleaded by defendant.
 

 [7]
 

 “There has to be a period of amnesia or relative amnesia; and if that is missing, then you cannot have the dissociative reaction.
 
 ’ ’
 

 [8]
 

 Deliberation and premeditation are, of course, not elements of the degree of murder of which defendant was convicted. (Cf.
 
 People
 
 v.
 
 Hoxie,
 
 252 Cal.App.2d 901 [61 Cal.Rptr. 37].)