[Crim. No. 6142. First Dist., Div. Four. Mar. 29, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. ALEXANDER JOSEPH MUSZALSKI, Defendant and Appellant.

Jerry G. Wright, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, John T. Murphy and William D. Stein, Deputy Attorneys General, for Plaintiff and Respondent.

DEVINE, P. J.—Appellant was convicted of first degree murder for the killing on August 4, 1965, of his wife, Nancy Muszalski; and of attempted murder for the shooting of his father-in-law, Frank Paloutzian. Appellant's wife had separated from him and was living with her parents. There was an interlocutory decree of divorce; a final decree would have been available in about a month. Appellant blamed his wife's parents for the separation and for preventing a reconciliation. They had accused him of being a "free-loader" because his wife was working and he was going to college, and because they said he bought nothing for her.

Following the separation from his wife in March of 1964, appellant made many attempts at reconciliation. At times the two cohabited; at other times, they were seen together by neighbors. On the day before the homicide, appellant talked with his wife on the telephone about three hours. He testified she told him she was still very much in love with him and wanted to come back to him, and that maybe if he had a good job her parents would not feel so bad if she came back, but she didn't think she was strong enough to break with her parents.

On the fatal day, appellant asked his mother to telephone Nancy, but she got Nancy's brother, Ray. Appellant's mother told her son that Ray said Nancy did not love him and could not "stand the bloody sight of him." Appellant did not appear to be upset. On this same day, appellant's mother had a conversation with appellant's attorney, who told her that attempts at reconciliation seemed to be no use. She testified that she related this, too, to her son. She advised him to forget Nancy and he said he would.

That morning appellant made an appointment to see a priest. He told the parish housekeeper that he wanted a reconciliation. He seemed upset and said it was urgent.

At dinner he appeared to his mother to be normal. At about

7 o'clock he phoned a friend, told him of his three-hour conversation with Nancy, said she had been undecided what to do because she wasn't sure how her folks would take it, and said he would abide by whatever decision she made.

Appellant went to the priest's house, but had to wait because of an emergency appointment which had been made with others by the priest. He left after a wait of about 45 minutes, at about 8:15.

He intended, he testified, to visit friends, but after recalling one of them would not be home, he decided to go to the Paloutzian home, to get everybody together and to see "who was lying or not." He arrived at about 8:30. He parked around the corner from the home because he thought Nancy's parents would call the police. One reason for this conclusion was an episode of August 26, 1964. On that day, appellant had come to the same home, had pointed a screwdriver at Nancy's throat and had said, "I'll kill you if you don't come out with me." Nancy's mother had grabbed the screwdriver; whereupon, appellant picked up a kitchen or butter knife and dragged Nancy across the street. He was met by a policeman, who had been summoned.

After parking his car, appellant testified, he walked towards the house, then recalled that Paloutzian was bullheaded and went back and got a gun from the car, thinking he could force everybody to talk and find out who was lying.

When Paloutzian came to the door, appellant told him he had a job as supervisor over five women at a cannery and that this was the lunch hour. (This was false; he did not have the job, although he may have had prospects for one.) He said he wanted to talk to Nancy, that if she said she didn't love him he would go away and wouldn't bother her any more. Appellant looked perfectly normal to Paloutzian. He kept his right hand in his pocket. The two talked for several minutes. Then Paloutzian called Nancy.

Just what was said when Nancy appeared is uncertain. Paloutzian testified that she started to say, "Bunny [appellant's nickname], you know I don't love you." Appellant testified that, following his colloquy with Paloutzian about seeing Nancy and Paloutzian's statement that she did not want to see him and did not love him, he, appellant, said he told Paloutzian that Nancy had told him just the opposite and that he wanted to talk to everyone to see who was lying. Nancy appeared. Appellant testified that she said, "Bunny, it's a lie" (that is, appellant's charge). It would seem likely

that these were Nancy's words because Mrs. Paloutzian, her mother, so reported to the police, and they put this into their investigating report.

Appellant pulled a snub-nosed revolver from his right-hand pocket. Paloutzian yelled to his son, "Ray, he's got a gun. Call the police." Appellant then fired twice through the screen door, hitting Paloutzian in the right chest, one bullet going through the shoulder and lodging in the left arm. Appellant then crashed through the screen door, ripping the center panel. The door bounced open and appellant brushed past Paloutzian as he fell to his knees. Appellant then ran towards the hallway and was grabbed by Mrs. Paloutzian, who was injured trying to stop him. Paloutzian then heard a noise in the hallway and another shot. As Paloutzian made his way down the hall, to Nancy's bedroom, he found his wife holding Nancy up. Appellant was standing against the door and Paloutzian attempted to tackle him with his uninjured arm. Appellant twisted away and ran through the living room into the kitchen where he broke open the latched door and ran off.

The victim, Nancy Muszalski, was shot through the head. She had been pinned in a corner of the room by the door. Mrs. Paloutzian saw appellant "right over her" (Nancy) immediately after the shot was fired.

When appellant was arrested about two and a half hours after the homicide, he denied any knowledge of it, said he had been hiking and told the police they had better look around for some "narcotic friends" of his wife's brother. He was wearing light blue-gray denim trousers that had been cut off above the knee; at the time of the homicide he had worn full length trousers. There was no blood on the denims.

Appellant's testimony about the fatal event following his decision to force everyone to talk, continues. He rang the bell, heard Nancy's father say, "It's Bunny, you better leave, Nancy," and then the door was opened. As he spoke with her father, the gun was in his right-hand pocket, but he was smoking a cigarette with his right hand. When he put the cigarette out, he placed his hand in his pocket with the gun, "because I didn't know where else to put my hand." When Nancy spoke, his "muscles tightened up," and the gun went off twice. It blew a hole in his pants pocket. He walked, then ran into the house, went directly to where Nancy was, "pointed the gun at her and shot her." He left by the back door, got in his car, and drove off. He became lost, pulled into an orange grove, placed the gun to his head and pulled the trigger four

or five times, but the gun didn't fire. He broke the hammer of the gun and threw it out the window. He then drove to a gas station where he changed his pants. He threw the ruined pants into the receptacle at the gas station. He testified that he had no intent to kill Nancy or her father. Appellant remembers pulling the trigger when he shot Nancy in the head, but he doesn't know why he did it.

Before discussing the points of law, we observe several points in appellant's testimony, and his acts or statements, which doubtless made it difficult for the jury to rely on his credibility. First, there is the false denial made to the police. Then there is the fact that appellant threw away the pants which probably were bloody from Paloutzian's tackling of appellant when Paloutzian was covered with blood. Appellant's testimony that he threw the pants away because he discovered the hole in the pocket and they were worthless, would be hard to accept. So would appellant's testimony that he saw no blood on them. The pants were never found.

The shooting from inside the pocket not only contradicted Paloutzian's testimony, but also is inherently improbable. Since Paloutzian was struck in the shoulder, the gun, if in the pocket, would have to have been pointed upward. The gun was not an automatic, so there had to be a separate pulling of the trigger (and not a single "tensing of the muscles") for each of the two shots at Paloutzian.

Appellant testified he tried to shoot himself but the gun didn't work. But live ammunition had been discharged at the corner of the Paloutzian home. It required pushing of a button and knocking to eject bullets from the cylinder.

Appellant could not remember the full name or the address (other than Glendale) of the man from whom he had taken the gun as a sort of security for a loan, although he also testified that the man "was a pretty good friend of mine."

### Instructions on the Felony-Murder Rule

The prosecutor relied for a first degree conviction not only on the proposition of a premeditated killing, but also on the theory that the killing had occurred during the commission of burglary. The burglary, as stated by the district attorney, was appellant's entry into the house with the intent to kill his wife or to assault her with a deadly weapon. ■ The felony-murder rule has been construed to include burglary even though the felony element of the burglary is an integral ingredient of the homicide itself. (*People* v. *Talbot,* 64 Cal.2d

691, 703 [51 Cal.Rptr. 417, 414 P.2d 633] ; *People* v. *Hamilton,* 55 Cal.2d 881, 901 [13 Cal.Rptr. 649, 362 P.2d 473].)

There could be advantage to the prosecution in the felony-murder rule because the deliberation otherwise necessary to produce first degree murder (for example, if the whole episode had occurred on a front lawn) would not be necessary, but only the intention, present on entry into the home, to kill or to assault with a deadly weapon. (*People* v. *Mason,* 54 Cal.2d 164, 168 [4 Cal.Rptr. 841, 351 P.2d 1025].)

Appellant protests that there was faulty judicial application of the rule in two respects: the felony asserted to have been intended at the time of entry was not specified or defined adequately, and the jury was not instructed that the asserted burglary must be proved beyond reasonable doubt.

It is true that the intended felony which would be an ingredient of burglary was not specified in the judge's instructions to the jury which defined burglary in its statutory terms. But the district attorney made it plain what his theory of felony-murder was. In his opening argument to the jury, he said: ''When that defendant walked inside that door, after shooting Mr. Paloutzian, he had on his mind that he was going to shoot Nancy with this pistol, he was going to commit an assault with a deadly weapon upon Nancy.

''And an assault with a deadly weapon is an unlawful attempt, coupled with the present ability, to commit a violent injury on the person of another with a deadly weapon.

''No question that a gun is a deadly weapon. A deadly weapon is a weapon that can be used to cause great bodily injury or death.

''His intention when he walked in that door was to use that gun upon Nancy. Because there would be no other reason for him to crash through the door and to trap her in the bedroom.

''So when he walked through that door with the intention of shooting his wife, of committing an unlawful attempt upon her with this deadly weapon, this present ability—he had the gun with him—the minute that he walked through that door with this on his mind, that he was going to use that gun on her, then he committed a burglary.''

Whether the intended felony was assault to commit murder (Pen. Code, § 217) or assault with a deadly weapon (Pen. Code, § 245), is not of prime importance under the particular circumstances of this case. Both are felonies, and they give evil character to the entry of a building and in particular, of

a home. ■ The purpose of the felony-murder rule is to deter persons from killing, even negligently or accidentally, by holding them strictly responsible for *all* killings they commit during the perpetration, or attempted perpetration, of any of the enumerated felonies. (*People* v. *Talbot, supra,* 64 Cal.2d p. 704.)

■ Appellant's next proposition is that because the jury was instructed on the elements of the felony of assault with a deadly weapon, the jury may have believed that the assertedly burglarious entry was related to an assault with a deadly weapon to be committed on Paloutzian, not on Nancy. The killing of Nancy, then, would not be committed in the perpetration of the burglary, for the object of the burglary would have been completed. The killing of Nancy would be an independent action, to be judged by the laws of homicide exclusive of that of felony murder.

The facts of the case and the manner of presentation by the prosecutor make this theory wholly improbable. Entry had been unnecessary for the shooting of Paloutzian. If appellant thought that his action on Paloutzian was incomplete and he intended to enter in order to kill him (or to shoot him a third time), he could have effected this purpose easily, for Paloutzian, already felled or falling, was just inside the door. It was Nancy, not Paloutzian, whom appellant pursued from the moment of entry. Here, again, the case takes form, not only from all of the facts, but also from the prosecutor's argument, in which, as appears from the portion quoted above (at page 618), he refers to appellant's having "on his mind that he was going to shoot Nancy" when he "walked inside that door, *after shooting Mr. Paloutzian*" (italics added).

■ Then, appellant argues that it is possible that only a misdemeanor was intended. He cites *People* v. *Failla,* 64 Cal.2d 560 [51 Cal.Rptr. 103, 414 P.2d 39], wherein a conviction of burglary was reversed for failure to define and to specify the acts which, if intended, would transform an entry into burglary. In that case, the conduct of appellant showed that the intended sexual acts following entry might have been a felony, a misdemeanor, or even no crime at all. In the case before us, the possible intended misdemeanor suggested by appellant is the exhibiting of a gun in a rude, angry or threatening manner, in violation of Penal Code, section 417. This theory was not advanced by appellant at the trial. Nor is it put forward in appellant's opening, but only in his closing brief on appeal.

We find the theory to be without merit on appeal. There was no testimony of appellant that upon his breaking through the door and entering, following the shooting of Paloutzian, he merely intended to brandish the weapon before his wife. Obviously, if appellant earlier had the intention of doing no more than bringing about a family conference or confrontation, by the display of the gun if necessary, this purpose would have ended with the shooting of Paloutzian. Appellant's acts show his intention as he broke through the screen of the door. He followed the victim, his gun drawn. He shook off the arms of her mother. He did not say anything, threatening or otherwise, to his wife, but, according to his own testimony, he just walked into the house and then ran directly to where she was, pointed the gun at her and shot her.

No instruction relating to the theory of a misdemeanor as having been intended was proposed, a circumstance which we note, not because the failure to request the instruction would preclude raising the point on appeal if the evidence had warranted the instruction (*People* v. *Wilson,* 66 Cal.2d 749, 759 [59 Cal.Rptr. 156, 427 P.2d 820]), but as merely one indication that the theory of commission of a misdemeanor was not present at the trial. Nor, apparently, was such a theory argued to the jury (no doubt it would have been regarded fatuous and would have reacted against defendant) for, although we do not have the defense argument, we find no rebuttal of this theory in the prosecutor's reply. In *People* v. *Wilson, supra,* conviction was reversed for failure to instruct upon the possible misdemeanor because (among other points) the appellant testified, as appellant here did not, that he *entered* his wife's apartment with the intent to scare visiting men with a shotgun, testimony which was supported by the fact that he allowed one man to leave unmolested and the fact that he shot others in what he considered to be self-defense. Here, the pursuit of the victim was immediate and unrelenting.

Appellant's next point is that although the jury was instructed on reasonable doubt, there was no instruction that the initial crime, burglary, which was asserted to make the homicide a murder in the first degree must be proved beyond a reasonable doubt. It was held in *People* v. *Whitehorn,* 60 Cal.2d 256, 264 [32 Cal.Rptr. 199, 383 P.2d 783], that a defendant is entitled to such an instruction on *request.* If, however, defendant did not request the instruction, as in the case before us, it is not perfectly clear from the *Whitehorn*

case whether the court must give it on its own motion. In *Whitehorn*, the court affirmed the conviction, saying that the jury must have understood that the requirement of proof of guilt beyond a reasonable doubt applies not only to proof of guilt of homicide but also to proof of circumstances which show that the murder was of the first degree, namely, to the proof that the murder was committed in the perpetration of forcible rape. This holding was based upon the facts that the court gave a general instruction as to reasonable doubt, one setting forth the felony-murder rule, and an instruction that if there was a reasonable doubt as to whether the murder was of the first or second degree, it must give appellant the benefit of the doubt. All of these instructions were given in the present case.

### Diminished Capacity; Instructions

■ The court instructed the jury on manslaughter in the terms of the statute, that is, that "voluntary manslaughter is the unlawful killing of a human being without malice upon a sudden quarrel or in the heat of passion." (Involuntary manslaughter was also defined, but the matter is not related to the appeal.) The court gave proper instructions on sudden quarrel or heat of passion. But the court did not, in its instructions on manslaughter, make reference to diminished capacity. Nor did the court make such reference in its instructions on malice with reference to murder. There was given, however, at the defendant's as well as the People's request, the instruction which was then an approved one, CALJIC No. 73-B, which read (it has been amended since) as follows: "You are reminded that a person might be legally sane, as we define the term in dealing with the question of criminal responsibility, and yet be in an abnormal mental or nervous condition; and because of such condition he might be less likely or unable to have or to hold a specific intent or a certain state of mind, which is an essential ingredient of a certain crime. We have received evidence bearing on the mental and nervous condition of the defendant at the time of the alleged commission of the crime charged. Such evidence may be considered by you in determining whether or not defendant did any act charged against him and, if so, whether or not, at that time, there existed in him the specific mental factor and intent which must accompany that act to constitute a certain crime or degree of crime. You do not have before you any issue as to defendant's legal sanity."

This case was tried about three months before the decision of *People* v. *Conley*, 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911], in which definite suggestions for instructions on the subject of diminished capacity were given, including the possibility of establishing lack of malice by "[s]howing that due to diminished capacity caused by mental illness, mental defect, or intoxication, the defendant did not attain the mental state constituting malice" (p. 325, fn.). Appellant contends that it was prejudicial error for the court to fail to give this instruction, although it was not requested and although it had not been formulated by the *Conley* case, because this was the law even before *Conley*.

The failure of defense counsel to request the instruction is not important, because the matter of capacity is clearly relevant to the distinction among the classes of homicide. (*People* v. *Henderson*, 60 Cal.2d 482, 489-490 [35 Cal.Rptr. 77, 386 P.2d 677]; *People* v. *Anderson*, 63 Cal.2d 351, 366 [46 Cal. Rptr. 763, 406 P.2d 43]; *People* v. *Aubrey*, 253 Cal.App.2d 912 [61 Cal.Rptr. 772]; *People* v. *Farr*, 255 Cal.App.2d 679, 686 [63 Cal.Rptr. 477].)

We must consider the evidence to see if there was prejudicial error in the omission. We observe at the start that there was no testimony whatever about the use of alcohol or of drugs by appellant; wherefore, cases of alcoholic amnesia (e.g., *People* v. *Conley*, *supra*, 64 Cal.2d 310), or alcoholic disorganization of the mental process (e.g., *People* v. *Ford*, 65 Cal.2d 41 [52 Cal.Rptr. 228, 416 P.2d 132]), or the alcoholic factor added to psychosis (e.g., *People* v. *Henderson*, *supra*), or acute drunkenness (*People* v. *Aubrey*, *supra*), are not comparable. Nor was unconsciousness asserted, as it was in *People* v. *Conley*, *supra*, and *People* v. *Anderson*, *supra*.

Diminished capacity could have resulted only from mental disease or mental defect. There was no evidence of organic trouble, as in *People* v. *Steele*, 237 Cal.App.2d 182 [46 Cal. Rptr. 704] (cerebral arteriosclerosis). There was no sudden change in personality, as in *People* v. *Goedecke*, 65 Cal.2d 850 [56 Cal.Rptr. 625, 423 P.2d 777]; nor of paranoia, as in *People* v. *Gorshen*, 51 Cal.2d 716 [336 P.2d 492], and *People* v. *Moore*, 257 Cal.App.2d 740 [65 Cal.Rptr. 450]; nor was the killing utterly bizarre, as in *People* v. *Nicolaus*, 65 Cal.2d 866 [66 Cal.Rptr. 635, 423 P.2d 787].

There was testimony from appellant's mother that he had been studying long hours, but this had ended some months before the tragedy. The mother testified, too, that he cried for

some three hours, but this was many months earlier. The essence of the testimony of the lay witnesses was that appellant was exceedingly eager to have a reconciliation.

Following the assault episode in August 1964, appellant went to the county hospital and endeavored to commit himself so that he wouldn't do things of that nature, for he was afraid he would act out his threats under the present stress. Their diagnosis on admission was possible schizophrenic action, but their final diagnosis was simple adult maladjustment with possible homicidal and suicidal tendencies. He was released.

There was but one expert witness, Dr. Vernon John Miller, a psychiatrist. His testimony was derived from two conferences with appellant, the total time being about an hour and fifteen minutes, together with information furnished by defense counsel. A synopsis of the testimony is: Appellant is a very dependent individual who had a prior history of poor control of his acts; he was most dependent on his wife and had an abnormal fear of losing her; he was an unstable person, this going back to his pre-adolescent years; he probably suffered from an acute dissociative reaction (this was not defined); pathologically dependent persons, as he, want constant reassurance; they are hostile at the dependent relationship; they may threaten with weapons; the wife's abrupt appearance on the scene and her emphatic verbal rejection probably triggered the shooting by this very disordered individual.

The witness was of the opinion that appellant did not intend to fire the gun at his wife at the time he did so. But the expert was working with hypotheses which the jury no doubt rejected. The first was that the shots fired at Paloutzian were through appellant's pants pocket, for he had been given that information by appellant or the attorney. The expert had not read the police report, and was not sure whether he had read the transcript of the preliminary hearing. Appellant at no time admitted to the expert firing at anybody. Moreover, the expert had no information about appellant's attempted deception of the police when he was arrested.

But most important is the fact that when the expert interviewed appellant on two occasions, on the subject of the actual killing of Nancy, appellant broke down, did not care to discuss it, and could not talk appreciably about it, so the expert did not press the matter. The doctor had a real question whether appellant could recall the alleged crime. He

could remember some details but everything had gone vague as far as recalling whether he shot his wife or whether he shot anyone else.

Actually, appellant testified to these matters in detail. He gave a specific account of his actions up to the ringing of the doorbell, including an account of how he got the gun, after thinking about it, on a return to the automobile. He told of his decision as to where he would park. He described the positions of the persons in the living room as he passed the window. He heard Nancy's father tell her to leave the room, and later call her back. He related his conversation with Paloutzian. He described the shooting of Paloutzian although, the jury no doubt thought, falsely.

Then, although he says everything "got vague" after Nancy spoke, he testified that he remembers entering the house, though not tearing the door screen. He testified: "I remember pointing the gun at my wife and pulling the trigger." He remembers someone trying to hold him.

When the expert was confronted, on cross-examination, with that part of appellant's testimony showing recall of the actual pointing of the gun and pulling the trigger, he replied that the emotional turmoil within the defendant interfered with adequate reasoning, so that the words spoken by Nancy triggered the two attacks. But it is apparent that the expert's prepared conclusion, as presented originally to the jury, was founded in part on premises which were unsound.

We shall relate the expert's conclusions with the two propositions advanced by the prosecution. For the felony-murder rule to apply, there was required only the specific intent, upon entry of the home, to assault the victim with a deadly weapon. Upon the considerations expressed below in connection with deliberation, but with stronger reason because of the lesser reflection required under the felony-murder rule, we conclude that if there was error in the court's instruction as given in this pre-*Conley* trial, it did not cause a miscarriage of justice.

The mental illness or defect referred to in the cases is one which takes away, even though temporarily, the *capacity* to form a specific intent to commit a crime which requires such intent, or to have the malice required for murder or the deliberateness required for first degree murder when malice is not supplied by the felony-murder principle. The thrust of the expert's testimony was, as we read it, mainly towards showing that an overwrought, dependent person was triggered into

action without use of his ordinary thinking process, by the victim's remark which rejected him. He acted on an impulsive basis. This has to do more with heat of passion (on which the jury was correctly instructed) than with mental defect. Appellant testified to his intention to threaten the family, if necessary, to effect his purpose. He had the capacity, by his own statement, to form this intent. If he had this capacity, why did he not have the capacity to form the intent to kill? The jury impliedly found that he had the specific intent to kill Paloutzian, because they were instructed that this is a necessary element of the crime of attempted murder. He may have been "triggered" by a remark. This circumstance involves the classical subject of adequate provocation to reduce a homicide to manslaughter, wherein the heat of passion must be such as would naturally be aroused in the mind of an ordinary reasonable person or in the mind of a person of ordinary self-control. (*People* v. *Brubaker,* 53 Cal.2d 37, 44 [246 P.2d 8].) The jurors were free to consider the expert's testimony on this subject, on which they were given the usual instructions.

Early in the trial defense counsel told the court that his whole defense was that of provocation. No doubt the *Conley* definition would have been given had the trial been held a few months later. When we consider, as the jury doubtless did, the earlier assault and the willingness of appellant, despite that episode, to confront Paloutzian with a loaded gun; the improbability of his account of the shooting of Paloutzian; the stalking of the victim; the manner of the killing, the falsity of the statements to the police; the throwing away of the pants and of the gun—we cannot say that there has been a miscarriage of justice.

### Asserted Misconduct

Appellant charges that the district attorney was unfair in his arguments to the jury. There was but one objection, however, and that to an insignificant remark. On overruling of the objection, no request for admonition was made. The point has been waived. (*People* v. *Wein,* 50 Cal.2d 383, 396 [326 P.2d 457].)

Appellant also objects to argumentative questions asked of the expert by the judge. On objection, the jury was admonished by the judge that he had no opinion as to defendant's guilt or innocence, that he was merely asking questions for clarification.

Jury having been waived on the penalty trial, the judge imposed a sentence of life imprisonment.

The judgment is affirmed.

Rattigan, J., and Christian, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 22, 1968.