Filed 12/1/15  P. v. Esparza CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CASIMIRO ESPARZA, JR.,<br><br>    Defendant and Appellant. | F067455<br><br>(Fresno Super. Ct. No. F13900454)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan B. Conklin, Judge.

Peter J. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Rachelle A. Newcomb, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

A jury convicted defendant of carjacking and second-degree robbery. He urges reversal of his conviction on several grounds. We reject them all and affirm.

## STATEMENT OF THE CASE

Defendant was charged with carjacking (count I – Pen. Code, § 215, subd. (a); second-degree robbery (count II – Pen. Code, § 211); and making criminal threats (count III – Pen. Code, § 422). The information also alleged that defendant personally used a firearm during the commission of each count. (Pen. Code, § 12022.53, subd. (b).) Finally, the information alleged that defendant had a prior serious or violent felony conviction (Pen. Code, §§ 667, subds. (a)(1) & (b)–(i); 1170.12, subds. (a)–(d).)

The People eventually moved to dismiss the criminal threats count and the motion was granted. Thereafter, a jury convicted defendant of carjacking and second-degree robbery, and found the personal firearm use allegation true. The court subsequently found the prior conviction allegations true.

The court sentenced defendant to an aggregate term of 33 years, which was comprised of the following: nine years on count 1, doubled for the prior serious felony conviction to 18 years; a concurrent term of five years for count 2, doubled for the prior serious felony conviction to 10 years; a stayed, consecutive term of 10 years for the personal firearm use enhancement; and five years for the prior prison term enhancement.

## TRIAL EVIDENCE

*Diane Seiler's 911 Call*

At 8:14 p.m. on July 25, 2012, Diane Seiler (Seiler) called 911 from a gas station. Seiler told the dispatcher that her boyfriend, Casimiro Esparza, Jr.,[1] held her at gunpoint

---

[1] Defense counsel contended at trial that defendant was not the perpetrator. The jury obviously concluded that Seiler was referring to defendant when she said her boyfriend Casimiro Esparza held her at gunpoint and took her vehicle. Therefore, we refer to the perpetrator identified in the 911 call as defendant.

before taking off in her car. Seiler recounted that about two minutes before the 911 call, defendant told Seiler she did not care about him and only cared about her car. Defendant then punched in her car stereo.

Seiler told the dispatcher that defendant was "going crazy" and had "like three guns on him." Seiler thought defendant was high on "crystal" or "cocaine." He repeatedly shoved a gun in her side and did not want her to pull over. Nonetheless, Seiler pulled the car over and "jumped" out of the car.[2] Seiler said she had gotten out of the car "just in time" and probably would have been shot if she had not exited the vehicle. Seiler told the dispatcher defendant had "gotten crazy before but never like this."

Seiler identified her boyfriend as a Hispanic male named "Casimiro Esparza" who was wearing a black shirt and plaid shorts. When asked what her boyfriend's date of birth was, Seiler said something unintelligible before responding: "7-8-72." Seiler also said she lived with Esparza. She described her car as a cream-colored 2006 Chrysler 300.

*Surveillance Footage*

Sheriff's Deputy Sher Moua was dispatched to the gas station Seiler described in the 911 call. Moua viewed surveillance footage from the gas station. The footage was of "mediocre" quality and was not useful for observing "closeup details." However, Moua was able to make out "skin tone, ethnicity, hair color, clothing," and "some of the lettering [on] certain objects." Moua reviewed the footage and observed a female[3] exit from the driver's side of the vehicle, followed by a Hispanic male with a firearm in each hand. Both firearms were pointed toward the female. The male got back in to the vehicle

---

[2] It seems clear Seiler was driving the car at least by the end of the incident. Seiler tells the dispatcher that she "pulled over" at the gas station. Surveillance footage showed a female exiting from the driver's side of the vehicle.

[3] Deputy Moua initially referred to the female in the footage as "Diane" but then immediately began saying "the female."

and the female appeared as if she was "trying to motion or say something to the male before the vehicle drove off."

*Recovery of the Vehicle*

On July 28, 2012, Sheriff's Deputy Daniel Buie observed the 2006 Chrysler 300 at Seiler's address. Buie reported the vehicle as having been "recovered" as of that date.

*Defendant's Arrest*

On September 20, 2012, Fresno Police Officer Gabriel Ramirez responded to 2723 W. Indianapolis to apprehend defendant. Defendant refused to come out of the residence for approximately 30 minutes after Ramirez arrived on scene. Ramirez told defendant "he did the right thing; that our intent was never to shoot him." Ramirez testified that defendant "basically said that he had f[**]ked up, and it was the drugs, and he apologized and thanked us for being gentlemen."

Defendant's provided his date of birth as October 8, 1969, which was later confirmed by police. This is not the date of birth Seiler provided in the 911 call.

*Stipulation*

The parties stipulated that defendant had been convicted of inflicting corporal injury to a spouse or cohabitant on May 26, 2010 and May 7, 2012.[4]

*Other Witnesses*

Samuel and Yvonne Esparza[5] were both called to testify. Yvonne answered a few preliminary questions, saying that defendant was her brother-in-law and that she knew Seiler. Yvonne then refused to testify further. Samuel Esparza[6] also refused to testify.

---

[4] The court had ruled *in limine* that these two convictions were admissible under Evidence Code section 1109.

[5] Since Samuel and Yvonne Esparza share a last name with defendant, we will refer to them by their first names for clarity. No disrespect is intended.

[6] Samuel said, "I'm not going to testify. That is my brother." When the court asked Samuel to specifically identify his brother, he refused to answer.

Seiler herself was called as a witness but she too refused to testify. All three witnesses were held in contempt.

*Jail Calls*

Defendant made several calls from jail that were recorded.[7]

*Closing Arguments*

Defense counsel argued to the jury that defendant was not the perpetrator.

I.   **CHALLENGED STATEMENTS IN DEFENDANT'S JAILHOUSE PHONE CALL FALL UNDER THE "ADMISSIONS BY A PARTY" EXCEPTION TO THE HEARSAY RULE**

Several jail phone calls purportedly made by defendant were recorded. In a phone call beginning at 1:26 p.m. on September 22, 2012, the following exchange occurred:

> "D[efendant]:  They got me for…
>
> "U:[8]  What?
>
> "D:          … carjacking, robbery, and all kinds of shit.
>
> "U:          Why'd they get you for robbery?  For when you took my car?
>
> "D:          Man.
>
> "U:          Huh?
>
> "D:          *Yeah whatever the case was, you know what I mean?*"
> (Italics added.)

Defendant contends these statements were improperly admitted because they do not fall under the adoptive admissions exception to the hearsay rule. The Attorney General contends defendant adopted Seiler's statement that he was charged with robbery because he had taken her car by answering her question affirmatively.

---

[7] The portions of those calls relevant to this appeal are described below.

[8] The transcript refers to the other person on the line as "Unidentified." However, on the call, defendant refers to the other person as "Diane."

5.

" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).)[9] "Except as provided by law, hearsay evidence is inadmissible." (§ 1200, subd. (b).) There are several exceptions which permit evidence that would otherwise be excluded as inadmissible hearsay. One exception concerns adoptive admissions. (§ 1221.) Adoptive admissions are statements "which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (*Ibid.*)

Defendant argues that his statements in the jail call are not adoptive admissions. The Attorney General disagrees, but also notes that the statement falls under another exception to the hearsay rule: admissions by a party. (§ 1220.) We agree with the Attorney General's latter contention. The hearsay rule does not prohibit evidence of a statement "when offered against the declarant in an action to which he is a party …." (*Ibid.*) Here, the statement was offered against defendant, who was the declarant and a party to the action. Therefore, the evidence was not rendered inadmissible by the hearsay rule.[10] (*Ibid.*) Accordingly, we do not reach the issue of whether the statement was also an adoptive admission. (See *People v. Martinez* (2003) 113 Cal.App.4th 400, 408 ["When a trial court erroneously relies on one hearsay exception to admit evidence that otherwise would have been admissible under a different exception, it cannot be said that the evidence was admitted in error."].)

---

[9] All future statutory references are to the Evidence Code unless otherwise noted.

[10] In his opening brief, defendant makes a related claim that the court erred in instructing the jury on adoptive admissions. (See CALCRIM No. 357.) The Attorney General notes that any error in that regard would have been invited since the defense requested the instruction in question. In his reply brief, defendant acknowledges: "It does appear that defense counsel made a decision to request that instruction, and therefore cannot complain on appeal that the instruction was given." We agree that if there was any error in giving CALCRIM No. 357, it was invited by defendant.

## II. DEFENDANT WAS CHARGED WITH OFFENSES "INVOLVING" DOMESTIC VIOLENCE AS THAT TERMINOLOGY IS USED IN EVIDENCE CODE SECTION 1109, SUBDIVISION (a)(1)

Defendant challenges the trial court's ruling that his prior convictions for inflicting corporal injury to a spouse or cohabitant on May 26, 2010 and May 7, 2012 were admissible under section 1109.

Generally, "evidence of a person's character or a trait of his or her character … is inadmissible when offered to prove his or her conduct on a specified occasion." (§ 1101, subd. (a).) Section 1109 establishes an exception to this rule by providing that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by section 1101 …."[11] (§ 1109, subd. (a)(1).) Defendant contends section 1109 provision does not apply because his trial was *not* a "criminal action in which the defendant is accused of an offense involving domestic violence" (§ 1109, subd. (a)(1)) because he was not charged with a domestic violence offense. The Attorney General disagrees and contends that the charges against defendant in this case are offenses "involving" domestic violence. (§ 1109, subd. (a)(1).)

Resolving this dispute requires us to consider the scope of the phrase "an offense involving domestic violence" and then determine whether the charges in this case fall within it. Fortunately, section 1109 expressly defines "domestic violence" for us as follows:

> " 'Domestic violence' has the meaning set forth in Section 13700 of the Penal Code. Subject to a hearing conducted pursuant to Section 352, which shall include consideration of any corroboration and remoteness in time, 'domestic violence' has the further meaning as set forth in Section 6211 of the Family Code, if the act occurred no more than five years before the charged offense." (§ 1109, subd. (d)(3).)

---

[11] The evidence may still be rendered inadmissible by section 352. Section 1109, subdivisions (e) and (f) contain exceptions to subdivision(a)(1) that are inapplicable here.

Penal Code section 13700 defines "domestic violence" as "abuse" of certain persons, including a girlfriend. (Pen. Code, § 13700, subd. (b).) " 'Abuse' means intentionally or recklessly causing or attempting to cause bodily injury, *or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself,* or another." (Pen. Code, § 13700, subd. (a), italics added.)

Given these definitions, we think it is clear defendant was charged with committing an "offense involving domestic violence" as that phrase is used in section 1109. There was evidence that defendant repeatedly shoved a gun in Seiler's side and told her not to pull over. Nonetheless, Seiler pulled over and "jumped" out of the car, believing she was going to be shot. This evidence was sufficient to show that defendant had "plac[ed] [her] in reasonable apprehension of imminent serious bodily injury …." (Pen. Code, § 13700, subd. (a).) By definition, defendant thereby committed domestic violence against Seiler as defined in section 1109, subdivision (d)(3).

Defendant seeks to avoid this straightforward conclusion by arguing that a crime is not an "offense involving domestic violence" (§ 1109, subd. (a)(1)) unless domestic violence is an *element* of the charged offense. In support of his position, defendant cites *People v. Story* (2009) 45 Cal.4th 1282 and *People v. Walker* (2006) 139 Cal.App.4th 782, which dealt with a similar provision: section 1108. Section 1108 permits evidence of certain prior sexual offenses in sex offense prosecutions. (§ 1108.)

We have rejected this argument in the past and do so again here. (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1237–1240 (*Brown*).)[12] While sections 1108 and 1109 have several similarities, "there are important statutory distinctions relative to defendant's definitional arguments in this case." (*Brown* at p. 1238.) Importantly, "the language in section 1108 is not as broad as that used in section 1109." (*Id.* at p. 1240.) Section 1108, subdivision (d)(1) " 'defines "sexual offense" to mean a "crime … that

---

[12] We decline defendant's invitation to overrule *Brown*.

8.

involve[s]" certain categories and enumerated types of sexual misconduct[]' " (*id.* at p. 1238, italics removed) while "section 1109, subdivision[] (a) … define[s] a prosecution 'involving' domestic violence by reference to definition contained in Penal Code section 13700 and Family Code section 6211, neither of which contain an enumerated list of offenses…." (*Id.* at p. 1240.) Therefore, *Story* and *Walker* are distinguishable.

## III. DEFENSE COUNSEL WAS NOT CONSTITUTIONALLY DEFICIENT FOR FAILING TO OBJECT TO PORTIONS OF SEILER'S 911 CALL ON CONFRONTATION CLAUSE GROUNDS

Defendant contends his counsel was ineffective for failing to object to portions of Seiler's 911 call that purportedly violate the Confrontation Clause under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) and *Davis v. Washington* (2006) 547 U.S. 813 (*Davis*).

For the reasons explained below, we conclude the objection urged by defendant on appeal is meritless. Since "[t]rial counsel is not required to … advance meritless arguments …." (*People v. Jones* (1979) 96 Cal.App.3d 820, 827), we reject defendant's ineffective assistance of counsel claim.

A. Confrontation Clause

The United States Constitution affords criminal defendants the right "to be confronted with the witnesses against him …." (U.S. Const., 6th Amend.) The Confrontation Clause's use of the term "witnesses" means "those who 'bear testimony.' " (*Crawford*, *supra*, 541 U.S. at p. 51.) Consequently, whether a person is a "witness" under the Confrontation Clause turns on whether their statements constitute "testimony" (i.e., whether they are testimonial).

One class of statements are clearly nontestimonial: those "made in the course of police interrogation under circumstances objectively indicating that the primary purpose

9.

of the interrogation is to enable police assistance to meet an ongoing emergency…." (*Davis*, *supra*, 547 U.S. at p. 822.)

Here, the circumstances objectively indicate the primary purpose of Seiler's 911 call was to enable police assistance to meet an ongoing emergency. The dispatcher asked several questions that sought information relevant to how law enforcement could respond to the situation. The dispatcher asked for the license plate of the vehicle, which way the vehicle was traveling when it left, and whether Seiler knew defendant's ultimate destination. And Seiler provided additional information for the apparent purpose of helping law enforcement safely respond to the emergency: Seiler informed the dispatcher: "I don't know where but my car's gonna over heat, it's gonna blow up somewhere." Seiler also told the dispatcher defendant was high and had several guns with him.

Even defendant acknowledges that the portions of the call where Seiler tells the dispatcher the nature and location of the emergency "probably qualify as having a primary purpose of dealing with an ongoing emergency." But defendant contends that later statements made during the call do not appear to have the same primary purpose.[13] We will address each of these statements in turn.

*1. Seiler's Statement Concerning her Vehicle "Blow[ing] up"*

Defendant points to a statement by Seiler that her car is going to overheat and "blow up." He contends this statement was not made with the primary purpose of helping law enforcement respond to an ongoing emergency. We do not agree. That the car was not in good working condition and was likely to overheat and "blow up" is plainly relevant to how law enforcement might choose to respond to the situation.

---

[13] Defendant initially claimed that the jury improperly heard statements in the 911 call that refer to him as a "third striker." In his reply brief, defendant acknowledges that this reference was in fact redacted.

10.

And even if that were not the case, we fail to see how admission of the statement would be prejudicial to defendant. Defendant claims this statement "left the jury with the feeling that [he] might destroy the innocent victim's car, just compounding their view of him as an evil person." Again, we disagree. Seiler does not say she thinks defendant plans to intentionally "blow up" the car. Instead, she said: "[H]e's gonna take off. I don't know where but my car's gonna *over heat*, it's gonna blow up somewhere. It's not even working good right now." (Italics added.) The clear import of Seiler's statement is that the car might "blow up" because of overheating, not because defendant would purposefully cause the car to explode.[14]

### 2. *Seiler's Statements Concerning Defendant*

Defendant next references Seiler's statements to the dispatcher that she thought defendant was "high"; that defendant had, minutes prior, punched her car stereo; and that defendant had "gotten crazy before but never like this." He contends these statements were not made for the primary purpose of enabling law enforcement to deal with an emergency. However, whether a carjacking suspect has been using drugs, has recently acted violently and has a history of acting "crazy" is indeed relevant to law enforcement's response.

### 3. *Seiler's Statements Concerning Where the Incident Began and Where Defendant was Possibly Headed*

Defendant also cites statements by Seiler regarding where the incident started and the fact that she did not believe defendant was heading home when he left with the vehicle. But, facts concerning the vehicle's prior path of travel and defendant's likely or unlikely destinations might well be relevant to how law enforcement would respond to the call.

---

[14] Consequently, even if the statement was irrelevant, its admission was not prejudicial.

### 4. *Unidentified Speaker's Statement*

Defendant next references an unclear portion of the 911 call:

"D[ispatch]: No no no no, did it start in front of the Chevron [station], the disturbance?

"S[eiler]: Yeah, yeah it's right right there was a a lady here she seen it all. She's letting me use her phone.

"U[nidentified]: Backed up into my leg.

"S: He went crazy.

"D: Okay.

"U: (Unintelligible)."

During this exchange an unidentified speaker interjects the sentence: "Backed up into my leg." Defendant contends the speaker was referring to him, but the Attorney General observes "there is no indication that the comment from the unidentified person who says '[b]acked up into my leg' is referring to *appellant* having done so." We conclude this interjected statement is far too vague to have prejudiced defendant.

Moreover, even if we assumed the jury paid attention to the statement of the unidentified speaker, and further assumed the jury interpreted the interjection as defendant suggests, we would not find prejudice. As defendant observes elsewhere in his brief, the truly disputed "issue in the case was whether appellant was the perpetrator, not whether the perpetrator was violent." The jury necessarily resolved the identity issue against defendant and the unidentified speaker's comment would not have impacted that determination.

### 5. *Seiler's Statement that She Believed She Would Have Been Shot if She had not Exited the Vehicle*

Finally, defendant cites Seiler's statement that if she had not pulled the vehicle over, she would have been shot. This statement, defendant contends, "in no way assisted the police in dealing with any ongoing emergency." We disagree. The fact that the last

12.

person to have seen the suspect believed he was willing to shoot someone in his current state would likely assist police in choosing how to deal with the emergency.[15]

## IV. DEFENDANT FORFEITED HIS CLAIM THAT THE TRIAL COURT ERRED IN INSTRUCTING THE JURY WITH CALCRIM NO. 362

Defendant next contends the trial court erred in instructing the jury with CALCRIM No. 362, which concerns consciousness of guilt.

However, at trial, defendant did not object to the trial court instructing the jury with CALCRIM No. 362.  "Any claim of error is therefore waived.  [Citation.]"[16] (*People v. Bolin* (1998) 18 Cal.4th 297, 326.)

## V. DEFENDANT HAS FAILED TO SHOW PREJUDICE RESULTING FROM HIS COUNSEL'S ALLEGEDLY DEFICIENT PERFORMANCE IN FAILING TO REDACT PORTIONS OF THE JAIL CALLS

Defendant claims his trial counsel was ineffective for failing to redact certain portions of jail calls purportedly played for the jury.[17]  We conclude the statements were not prejudicial.

---

[15] Defendant also contends that several of the statements identified above were irrelevant.  We disagree.  One of the elements of robbery is that defendant accomplished the taking by "means of force or fear."  (Pen. Code, § 211.)  Seiler's statements that defendant was "high," had punched her car stereo; had "gotten crazy before but never like this"; and would have shot her if she had not left the vehicle, are all relevant to the "fear" issue.  And, as an element of the offense, the issue was indeed contested at trial. (See Pen. Code, § 1019.)

[16] In his reply brief, defendant argues that under Penal Code sections 1259 and 1469, we may overlook his lack of objection in the trial court.  However, that power is discretionary (see *People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1525; *People v. Abbaszadeh* (2003) 106 Cal.App.4th 642, 649), and we decline to exercise it here.

[17] The parties agree that at least one jail call between defendant and Seiler was played for the jury.  Defendant, however, contends that several additional jail phone calls were played for the jury.  The Attorney General disagrees, and submits that "only one of the statements [defendant] claims should not have been before the jury was actually before the jury."  We need not resolve this dispute because we conclude that the admission of each of the statements identified by defendant were harmless.

13.

A.  Ineffective Assistance of Counsel Claims

"A defendant seeking relief on the basis of ineffective assistance of counsel must show both that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates, and that it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings. [Citations].  If the defendant fails to establish the prejudice component of the ineffectiveness claim, a reviewing court need not determine whether counsel's performance was deficient.  [Citation.]"  (*People v. Hayes* (1990) 52 Cal.3d 577, 608.) Indeed, that is the preferred course for resolving ineffective assistance of counsel claims. (*Strickland v. Washington* (1984) 466 U.S. 668, 697 ["If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."].)

Defendant identifies several portions of the jail calls he believes were prejudicial. We conclude the admission of these statements was not prejudicial.

### 1.  Admission of Defendant's Apparent Reference to the Sentencing Scheme of Penal Code Section 12022.53 Was Not Prejudicial

Defendant first cites the following exchange in one of the jail calls:

"U[nidentified male]: What happened? (unintelligible).

"M[ale caller – Casey (i.e., defendant)]: Man it's not good.

"U: What happened?

"M: Not good at all.

"U: Why?

"M: F[**]k. (unintelligible) all kinds of shit. *Talkin' ten twenty life*[18] ….

---

**18** Defendant's statements are presumably a reference to the sentencing scheme of Penal Code section 12022.53, which establishes several firearm use enhancements.  The statute is "also known as 'the 10-20-life law' [citation] …."  (*People v. Jones* (2009) 47 Cal.4th 566, 570.)  In this case, the prosecution alleged that defendant violated

14.

"U: (unintelligible).

"M: *Ten twenty life*.

"U: Yeah right.

"M: Serious bro."[19]

Defendant contends counsel was deficient for failing to redact his apparent references to possible prison sentences he might face if convicted.[20]

"It is fundamental that the trier of fact, be it court or jury, must not consider the subject of penalty or punishment in arriving at its decision of guilt or innocence…." (*People v. Moore* (1968) 257 Cal.App.2d 740, 750.)  "[P]roviding jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion. [Citations.]"  (*Shannon v. United States* (1994) 512 U.S. 573, 579.)

---

subdivision (b) of the statute, which "provides for an additional and consecutive 10–year prison term …."  (*People v. Oates* (2004) 32 Cal.4th 1048, 1052.)  Other subdivisions in the statute provide for a 20-year prison term and a 25 years-to-life prison term.  (*Ibid*.)

[19] Defendant made similar statements in another call:

"M[ale Caller – Casey (i.e., defendant):   Yep, I went [to court] today, it doesn't look good.

"F[emale]:    Why what they tell you?

"M:    Talking 10-20- life.

"F:    What?

"M:    10-20- life."

[20] In his opening brief, defendant similarly claimed that his counsel was ineffective for failing to redact or censor the 911 call to eliminate a reference to him as a "third striker."  After defendant filed his opening brief, the trial court adopted a settled statement concerning certain issues raised in this appeal.  (Cal. Rules of Court, rule 8.346.)  In his reply brief, defendant acknowledges that the settled statement establishes that the 911 call was indeed redacted to exclude reference to defendant's prior criminal history.  Therefore, defendant "agrees that this is no longer an issue on appeal."

Here, the admission of defendant's statements placed vague sentencing information before the jury.  However, we need not decide whether the admission of that evidence was erroneous in this case because we conclude it was harmless.  The jury was directly instructed that they "must reach a verdict without any consideration of punishment."  (See CALCRIM No. 3550.)  We presume the jury followed this instruction and thereby avoided any prejudice to defendant.  (See *People v. Cruz* (2001) 93 Cal.App.4th 69, 73 ["we presume that the jury 'meticulously followed the instructions given.' "].)

### 2. Admission of Defendant's Statement that he did not Have Money "on" Him was not Prejudicial

Defendant next points to a statement in one of the calls where he says he does not have "money or nothin' on me either…."  He claims this statement should have been excluded because a defendant's "wealth or lack of wealth is entirely irrelevant to criminal charges against him."  However, we do not read this statement as referring to defendant's wealth or lack thereof.  When someone says they do not have money "on" them, they usually simply mean that they do not have cash on their person.  The phrase "on me" is not usually included when the speaker is referring generally to their wealth.  ("I don't have any money" vs. "I don't have any money *on me*.")[21]  Defendant was not prejudiced by the jury knowing he did not have cash on his person while he was detained.

---

[21] The context suggests that defendant may have made the statement to explain why he could not call an unnamed female he had been discussing:

"U: Where at? So hey so what do you want me to do?

"M: F[**]k.  Um yeah call her up.  Hey.

"U: Tell her what?

"M: Huh? F[**]k I (unintelligible) *I don't even have no money or nothin' on me either*….

"U: And tell her what?

16.

### 3. Admission of Defendant's Statement Concerning a "Pink Slip" was not Prejudicial

Defendant also points to the following statement, which is largely incomprehensible: "…man um 'cause she has she has all the information f[**]kin' you know from my the [*sic*] to get the pink slip from my truck and all that shit." In his briefing on appeal, defendant describes this statement as an attempt to "make arrangements for someone to get the 'pink slip' to a vehicle…." Defendant then extrapolates that the "pink slip" was "apparently" referenced because defendant was trying to acquire money. As a result, defendant contends, the statement should have been excluded as an improper reference to his financial status.

We do not believe the context supports defendant's interpretation of the "pink slip" reference. Earlier in the same call defendant says: "[I]n the glove box … of the car…. [¶] …I got the paperwork … with my name on it so how in the hell were they gonna f[**]kin' charge me?..." To the extent it can be understood at all, defendant's statement seems to reflect a belief that he had a legitimate defense to the charges against him. Therefore, admission of the statement was not prejudicial.

### 4. Admission of Defendant's Statement Concerning an Attorney's Phone Number was not Prejudicial

Defendant next relies on another statement: "[T]ell Diane … to … have … her give you the number for Bianca and then there's an attorney's number right there too in the text to see what they say." Defendant argues the prosecution cannot use a person's invocation of the right to counsel against them. (Citing *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 65.) It is true that a prosecutorial argument that "*penalizes* exercise of the right to counsel is … prohibited. [Citations.]" (*Ibid.*, italics added.) But in this

---

"M: And see what's going on. Try to call right now. See if we can do it three way.

"U: Alright hold on (unintelligible).

"M: I don't have three-way. I don't have three-way."

case, defendant was not penalized – the prosecutor did not attempt to use defendant's exercise of his right to counsel against him. And even " 'if the remarks had the objectionable effect of drawing the jury's attention to the exercise of protected rights,' the verdicts were certainly not affected by this ' "brief and mild reference" '…. [Citation.]" (*Id.* at p. 66.)

### 5. *Admission of Defendant's and Seiler's Statements Concerning Their Troubled Relationship was not Prejudicial*

Finally, defendant points to a portion of one jail call where Seiler told defendant she loved him and said she tried to do "everything" for him. Seiler later recounted on the call that defendant had told her in the past she was "boring."[22] Defendant contends these portions of the call improperly seek to evoke sympathy for Seiler. The Attorney General counters that defense counsel had a legitimate tactical reason for allowing these statements: They were consistent with the defense theory that Seiler falsely accused defendant on the 911 call because they had a troubled relationship.

The closing arguments of defendant's trial counsel support the Attorney General's position. Defense counsel argued to the jury:

> "I am not going to go through the entire transcript of the entire jail call. Again I would encourage you to listen to it. But you will recall from that, and you can refresh yourselves, you can refresh your memory as to that again by playing the jail call, and by reviewing the transcript as an aid to that, they have a troubled relationship."

Counsel later argued:

---

[22] Seiler appears to have also recounted that defendant had called her "ugly" and "fat."

"U: Mm hmm. But you told me I'm boring….

"D: Do you hear me?

"U: …I'm ugly, I'm fat."

"She [Seiler] is not upset at the idea that he [defendant] held her up at gunpoint because that never happened. He never did that. What is upsetting her is she worked so hard to keep up the [*sic*] end of the relationship. She does everything for him. She makes breakfast for him. She makes eggs the way he likes them. And notwithstanding that, he rejects her."

Defendant responds by arguing that trial counsel could have made the same argument relying solely on the 911 call because that call also demonstrated turbulence in the relationship. However, when we are faced with an ineffective assistance of counsel claim, we "will not second-guess trial counsel's reasonable tactical decisions. [Citation.]" (*People v. Kelly* (1992) 1 Cal.4th 495, 520.) Trial counsel could have reasonably concluded that additional evidence of the turbulence in defendant's relationship with Seiler (beyond the 911 call) was helpful.[23]

### DISPOSITION

The judgment is affirmed.

_____
POOCHIGIAN, J.

WE CONCUR:


_____
GOMES, Acting P.J.


_____
FRANSON, J.

---

[23] The settled statement adopted by the trial court relates the following: During an off-the-record discussion, defense counsel "acquiesced to allow all of [defendant's jail call with Seiler] to be played for tactical reasons…."